**La COUR Du ROI, INC., Appellant and Cross-Appellee,**

v.

**MONTGOMERY COUNTY, Texas, Appellee and Cross-Appellant.**

**No. 09 84 288 CV.**

Court of Appeals of Texas, Beaumont.

Aug. 29, 1985.

Rehearing Denied Sept. 18, 1985.

C. Charles Dippel, Houston, for appellant.

Randall W. Morse, Houston, Steve Bickerstaff, Austin, for appellee.

## OPINION

BROOKSHIRE, Justice.

Montgomery County (hereafter "County") was plaintiff and cross-defendant in the trial court. La COUR Du ROI, INC., (hereafter "Du ROI") was defendant and cross-plaintiff below. County sought temporary and permanent injunctive relief and damages based on Du ROI's failure to comply with statutes, rules and regulations pertaining to subdivision development in the County. Du ROI pleaded for a declara-

tory judgment that those statutes, rules and regulations were void and unenforceable. Du ROI also pleaded for relief declaring the nature and extent of the County's power, rights and jurisdiction concerning the subdivision, "The Wilderness", as well as the rights and obligations of the parties under the statutes, rules and regulations concerning subdivisions. Du ROI additionally counterclaimed for damages under the Civil Rights Statute, *42 U.S.C.A. Sec. 1983* (West 1981), and for reasonable attorney's fees in part under *TEX.REV.CIV.STAT. ANN. art. 2524–1* (Vernon 1965 and Vernon Supp.1985), popularly known as the Uniform Declaratory Judgments Act. Alternatively, Du ROI pleaded that the County had no power to regulate subdivisions within 5 miles of an incorporated city. In brief, County complained of Du ROI's development of "The Wilderness", an unrecorded subdivision of land. County contended that the counterclaim below involved solely the controversy between it and Du ROI regarding "The Wilderness", attempting to defeat recovery of attorney's fees under the Declaratory Judgments Act. Judgment was rendered that the County take nothing and that Du ROI take nothing as to any of its claims, including attorney's fees. Both parties appealed.

### Contentions on Voir Dire

To the venire panel the County announced its theory of the case. It contended that R.V. King's corporation, La COUR Du ROI, INC., had sold subdivided tracts in Montgomery County to purchasers. King and his corporation had laid out roads either for public use or for the use of the owners in the subdivision, failing to make a proper plat or map of the same. County also contended that King had not obtained acknowledgements to the plat. He failed to file the plat. He failed to record the plat. The reason for these failures was that King had not met the requirements to make the plat recordable. He did not approach the Commissioners Court with his plans or plat.

The County said that those requirements were that he, King, provide adequate right-of-way for the roads; that he provide an adequate street cut; that he properly build the roads; adequate drainage should be provided. King had failed to give the Commissioners Court a bond to secure the performance by the subdivider. The County additionally contended that, if the subdivider had approached and communicated with the Commissioners Court, the plat would have been refused. The County maintained that he should have come to the Commissioners Court, complied with County's rules and regulations, obtained approval and filed the plat before selling the parcels of land.

The trial attorney for Du ROI stated that the corporation was R.V. King's and that King owned its stock. The defendant's attorney stated that there were 500 unrecorded subdivisions in Montgomery County and that people who lived in some of these unrecorded subdivisions wanted better roads and maintenance. Du ROI's attorney said that King's name was on the list of about 36 or 37 people who had put on unrecorded subdivisions. He said the County did not want to accept the subdivision plat; yet, it wanted the roads improved at the developer's expense.

The defense further contended that the County, for the first time in 1983—being about 7 years after inception of the subdivision—sent a letter to King saying that his corporation (as to "The Wilderness" subdivision) did not meet the county standards on roads and that King had not prepared a recordable subdivision plat. The defense also contended that the county wanted King and his corporation to file a subdivision plat with the Commissioners Court and improve the roads according to the 1980 subdivision rules, standards and regulations. The defense pointed out that the 1980 rules and regulations were adopted by the County after the subdivision was platted in 1976. Most of the tracts were sold by the end of 1978. The County also wanted a bond to insure performance.

It was explained that the corporation had a lawsuit against the County under the civil rights statutes. Basically, it was contend-

ed that the County had no authority to make the demands that it was making in this litigation and that the corporation should recover attorney's fees, plus a money award from the jury for violation of civil rights.

Du ROI purchased 1,140 acres of land from King. This acreage is located on and adjacent to the Egypt-Honea Road, a county road for many years. There was an oilfield road located on the tract. Several smaller roads were put in. From 1976 to 1978, the subdivision sold about 135 to 140 parcels. The defense lawyer conceded that King was in the business of subdividing land and that is what the corporation did. At the time of the trial King or his corporation still had about 40 of the original parcels of land. In each case, someone had contracted with Du ROI or King to purchase the title.

Some of "The Wilderness" subdivision was in the Lake Creek area. When Lake Creek rose some of the property was submerged and for sale signs appeared in substantial numbers. Voir dire was concluded.

### Narrative of Background

The first witness was Robert V. King. He was, at the time of the trial, President of La COUR Du ROI, INC., a Texas corporation. He stated that it was a solvent corporation. King was also the President of Northlands, Inc., which was claimed to be the same as Du ROI. King owned all the shares in La COUR Du ROI, INC. He ran Du ROI. He could not remember the names of the vice-president or the secretary-treasurer. They did nothing, having no duties.

In November, 1974, Du ROI obtained title to a tract of land containing 1,140 acres. King stated the corporation divided that property into parcels to be sold to the public and that the development had been referred to as "The Wilderness" subdivision. He said nearly all the property was sold in 1977 or 1978. He testified that "The Wilderness" subdivision had roads but that they were not laid out for public use. He did collect a road maintenance fee for some years. It amounted to $2.50 per month per acre in the beginning. It was raised to $3.50. Later the maintenance of the roads was turned over to a Civic Club. At first road maintenance fees were sent either to King or the corporation. King admitted Du ROI laid out the roads for the purpose of the subdivision and that these roads were for the use of the lot owners in "The Wilderness". King affirmed that. He also said the roads had been used by the Superior Oil Company and Hill Oil Company. King testified that the purchasers owned the roads. Du ROI had sold the property to each lot owner to the center line of the road. "The Wilderness" subdivision was for sale to the general public. He had a plat prepared of the subdivision to show to prospective purchasers, but only a few saw it.

County's Exhibit No. 30 was introduced into evidence. It is a map showing the subdivision of the 1,140 acre tract, being certified to by Michael Case, a registered public surveyor, on January 12, 1976. The certificate is:

"I hereby certify that this is a true representation of a subdivision of the above tract as surveyed on the ground by me. All corners are shown both natural and artifical [sic] are as found or set by me at this date."

Lake Creek was shown on County's 30, as was the Egypt Road, being blacktopped. The map of the subdivision shows "Valley Wood Acres" adjacent to the north. King conceded that the Egypt-Honea Road was a public road and Du ROI subdivided land into lots straddling that road. King examined a deed from Du ROI to James R. Vancourt which read in part:

"Tract One Hundred-Four (104) of *the Robert V. King, a [sic] unrecorded subdivision of 1140.54 acres* of land in THE ARCHIBALD HODGE Survey, A–18 of Montgomery County, Texas and more particularly described by metes and bounds as follows:" (Emphasis added)

Tract 104 was deep in the interior of the subdivision. Referring to certain covenants or restrictions on 104, he read:

"12. ... This land and the *public road in front* of this land shall be kept free of litter or trash." (Emphasis added)

King said that he did not know if it was a public road or not and did not know if it had been a public road prior to the time he purchased the land. He maintained that it was a prior existing road that touched on two sides of Tract 104. King testified that the road had probably been in existence for 20, 30 or 40 years. His attorney had a picture that showed a gate across the road with a "Keep Out" sign. King conceded that he had laid out one or two roads for the use of the purchasers.

He further conceded that there existed between 130 and 145 legal instruments, involving either deeds or contracts for deeds, and that a good number of them were on file in the County Clerk's office and that each contained the public road language or designation. County's Exhibit 30, however, had not been filed or recorded in the County Clerk's office and he had not sought in any manner to obtain the approval of the Commissioners Court prior to, or subsequent to, the sale of any of the tracts. He admitted that he had not made himself known to the Commissioners Court or to the County Clerk.

The subdivision was not used for residential purposes before 1975. After it was sold, however, the subdivision was restricted to residential use. Nor had King approached the government of the City of Conroe about the approval of the subdivision. King admitted that he did not have 32 feet of street cut or compacted subgrade on all the roads. King said some of the subdivision was in the flood plain. He also testified that the roads did deteriorate a good deal in wet weather especially if heavy trucks used them.

King testified that he did seek a permit from the Montgomery County Health Department. After the department examined the acreage, it determined that it was permissible to use septic tanks. Building permits were issued allowing septic tanks.

There are no street lights in the subdivision. King further testified that he did not

intend to further plat the subdivision more than that already done, nor did he have any intention of further improving the roads nor of putting in drainage structures or improvements. He did not intend to tender a bond for performance. He had no intention of entering into any written contract with Montgomery County and a court order would be required to make him do so.

King changed the name for La COUR Du ROI, INC., to Northlands, Inc., by filing a name change with the County Clerk in Harris County. King thought that the land was within 5 miles of the City of Conroe and that, therefore, it was subject to the city's jurisdiction. He said he never went to the city to have his map or plat approved by the city.

### The Roads

King estimated about 18,000 linear feet of roads exist in "The Wilderness" that need to be maintained. The County contended that it would cost $15.00 per linear foot to construct these roads, thereby showing that it would cost $270,000 to properly complete those roads, but that only $405 a month was being collected for maintenance. King said he was willing to help on the *maintenance through the Civic Club* but that he was *not willing to pay any money to the County to rebuild roads*. He said he would not be willing to pay money to condemn the rights-of-way if the roads were private and classified as such.

### One Foot Strip Annexation

The ordinance concerning the Conroe annexation along F.M. 1488 was called a spoke or strip annexation, having been passed in 1966. A large portion of that *annexation was deannexed in March, 1976*. King agreed he was still making contracts for deeds in 1977 and he had some repossessions in 1981 and 1982. At trial time he still had a number of deeds to make out; that is, the actual conveyances of the property, for the corporation.

### The County Engineer

James D. Blanton, the County Engineer and Flood Plan Administrator for Mont-

gomery County testified. He was a professional engineer. The engineer proved up Exhibit 24 as the County's 1980 regulations for subdivisions, drafted in the engineer's office. Blanton testified that the County and his department were concerned with getting the subdivisions recorded so that they would know where the subdivisions were within the county, especially with respect to the flood plain. Where the lot lines lie was important. The County was interested in the type of drainage work and construction that were done within the subdivisions. Another major concern was the road construction itself. The concern was that the roads should be constructed according to County's standards so that the County would not have to spend the taxpayers' money on subpar roads. The Engineer's Office inspects the roads and the plat. These inspections are made in person by members of the engineering department.

### The County's Rules and Regulations

The 1967 rules required a 60′ right-of-way, with the surfaced, traveled roadway of 20′. Beneath the traveled portion were required 4 inches of compacted base. Each shoulder was required to be 6′ wide; the 20′ traveled part was to be a paved surface. These requirements were necessary because Montgomery County had an average of 53 inches of rain each year and the surfacing was required to keep the moisture out of the base materials so that the road would not deteriorate.

Blanton explained the 1980 requirements. The 60′ right-of-way and the shoulders remained the same in 1980 as they were in 1967. Another requirement was that the amount of the bond was changed from the $3.00 per linear foot in 1967 to $15.00 per linear foot in 1980. The 1980 regulations were based on public hearings and the experience of road failure with resulting potholes. Blanton testified that King had never come to the Engineer's Office to offer this subdivision plat nor to offer a drainage plan for approval.

### Flood Plain and Floodway

Blanton further testified that about 56% of the 1,140 acres of the subdivision was in the 100 year flood plain and that 30% actually lies within the floodway. He testified that the flood plain by definition is the area where a flood can be expected once every 100 years, or 1 chance in a 100 each year. The actual history of Montgomery County shows that it has experienced 100 year floods as frequently as three times in a given year. In layman's language, the floodway is the area containing the swiftest and the most dangerous water within the flood plain. Usually the boundaries of floodways are on either side of a creek or a river. In the flood plain a person can obtain a type B building permit which requires a permittee to elevate the slab about the 100 year flood plain. But in the floodway, itself, the County will not issue a building permit of any kind for permanent structures.

Blanton had personally inspected the subdivision known as "The Wilderness". He testified that some of the roads were basically impassable and that they did not meet the 1967 rules and standards of the county. He testified that most of the subgrade was not 32′ wide, meaning a 20′ roadway or travel way with 6′ shoulders. He said most of the roads in the subdivision appeared not to have had any base at all. Most of the bridge structures did not have railings and appeared to be inadequate in size to take care of the drainage. He further testified there was no hard surface on the roads that he was able to find during his inspection. Some of the roads were too narrow and would quickly deteriorate under use by heavy trucks. Some of the roads were too narrow for two opposing vehicles to pass. One road had but one lane. He testified that it would cost about $20.00 to $25.00 per linear foot to construct a road to county specifications. Later he said $12.00 to $15.00 per linear foot might be an overall average. Some of the roads needed both base and surface and would require widening and ditches.

He said the 18,000 linear feet of roadway in the subdivision, at $15.00 per linear foot, would cost $270,000. But he testified there was probably more like 23,000 linear feet rather than 18,000 linear feet of roadways. The engineer estimated that 23,000 feet of roadway (60 feet wide) would amount to more than 30 acres of right-of-way. This acreage would cost about $3,000 per acre, totaling an additional $90,000. $90,000 would be needed for condemnation purposes as well as $270,000 to construct the roads to comply with the 1967 standards.

The engineer testified that Montgomery County's rules and regulations were less stringent than those of the City of Conroe in 1967. The engineer testified that most of the subdividers or developers cooperated with the county voluntarily but that Mr. King had not voluntarily cooperated in any way to bring "The Wilderness" subdivision up to standard. Blanton said King had never brought any subdivision plat into the County Engineer's office.

### Purchaser Vancourt

James Vancourt, 39, lived on Windmill Lane in "The Wilderness" subdivision. He purchased his lot in November, 1976, and paid an average of $2,850 an acre. He bought six acres; he had been paying a road maintenance fee. He understood King was to maintain the roads. He testified that King promised him an all weather road. He had talked to King personally on several occasions. Vancourt was on the road maintenance fund committee of the homeowners association. From his observation, the combination of heavy trucks and a good rain devastated the roads. He testified that there were between 3½ and 4 miles of roads in "The Wilderness" subdivision, but only 1 mile was usable by school buses and mail carriers. He testified that there were 6 permanent homes in the subdivision.

Vancourt conceded that there was a sign on the road coming into the addition declaring it a private drive. When Vancourt bought his first tract, he was shown a plat. Vancourt expected access to his lot in all seasons. He did not expect that during a heavy rain his property would become unreachable. He testified the roads in 1976 and 1978 were maintained by King. Vancourt testified that he helped in handling the maintenance monies. He said these monies were not adequate to improve the roads, with about $1,900 that was on hand. He swore the maintenance fees were not adequate to maintain the roads in their present condition.

### Purchaser Larry Thompson

Larry Thompson is 48 and lives on Possum Hollow Road in "The Wilderness". He purchased tract No. 72. He received two tax bills one year. He went to the tax office and found a change in his tract number. This occurred about three years after he bought tract 72. Later No. 116 was assigned to his tract. Both numbers applied to the same tract. He actually received two different tax bills. He bought a little over 5 acres and paid $3,200 an acre. He maintained that there was nothing in his contract about a road maintenance fee.

At the time Thompson bought his land there was no road to his tract. He had to walk to it. He asked the land agent how he was going to get to this property. The land agent showed him a plat showing a road easement to his land. The easement was going to be cleared for the Thompsons, resulting in an actual road to his tract. But until the day of the trial there was no road where the land agent had promised. Thompson said he was driving on the dirt. He claimed, on the day he testified, that there were puddles of water standing "clear across the road and it's eight to ten inches deep." He testified that the land agent said: "Well there'll be a road big enough that you can get in and out year around with your car." Thompson testified that several months after his purchase King called saying that he wanted to talk with Thompson. King explained that Thompson was driving in on a pipeline easement. King wanted to change that. King wanted to take a certain corner off the property and add a foot on the side. Thompson replied he had already registered his contract with the county and he

refused King's request. He then questioned King about the need for the requested easement, especially a 60' easement. He asked King: "Why do we need it?" Thompson sworn that King said: "Because the county says we have to have a *sixty foot road easement when you're in a subdivision.*" (Emphasis added) Thompson maintained that *there was no road to his property.* He claimed that his tract number was changed from the original tract number on his lot and the road easement had been moved from where it was shown on the plat he received when buying his tract. Thompson maintained that King had afforded him only an easement which was placed on the top of a pipeline. He used it to drive into his property but he said it was not a road, stating: "It's where the pipeline cuts trees down." Thompson possessed a plat the salesman gave him at the time of his purchase. This plat was marked County's 26.

### The Foot Wide Strip Annexation

■ Du ROI argues that "The Wilderness" lies within 5 miles of Conroe's limits. Hence, the County has no jurisdiction over it. Conroe annexed a foot wide strip of land along F.M. 1488. It appears the city did not and could not extend the usual utilities and municipal services as far along F.M. 1488 to a point approximately south of "The Wilderness". A major purpose of *TEX.REV.CIV.STAT.ANN. art. 974a* (Vernon 1963) is to cause plats of subdivisions near or adjacent to cities to conform "to the general plan of said city" and its streets, parks, utility facilities, etc., with regard, inter alia, for extension of sewer, water mains and public utilities. Other important purposes of *art. 974a* simply vitiate and negate 1 foot strip annexations as being a basis for exclusive jurisdiction of the cities within a 5 mile radius. Conroe repealed most of this strip annexation in March, 1976. The repeal ordinance declared in relevant part:

"Section 1.: The Council finds that the strips of land hereinafter described are not suitable or necessary for City purposes, are uninhabited, and do not contain any property subject to taxation by the City."

The City "detached" all of the one foot wide strips along the north side of F.M. 1488, annexed by Ordinance 303, situated westerly of the west line of the Henry Proseus Survey. We are unwilling to hold the 1 foot strip annexation when considered with *art. 974a* —and its purposes—defeats the County's jurisdiction in the 5 mile zone. "The Wilderness" is more than 5 miles outside of the regular, ordinary limits of Conroe. We perceive after the March, 1976, deannexation the remaining 1 foot strip was more than 5 miles from "The Wilderness" Many of the sales were after March, 1976. We hold the 5 mile zone rule does not apply to 1 foot strip annexations.

### Article 6626a

The trial judge ruled that the statutes, county rules, and regulations were valid and constitutional but that before September 1, 1983, Montgomery County had no jurisdiction to regulate Du ROI in its activities and actions concerning "The Wilderness" subdivision and denied any injunctive relief. The County forcefully asserts this is error. We agree. We sustain the County's Point of Error One and hold that the trial court's ruling is reversible error. The trial judge also denied attorney's fees to Du ROI.

Du ROI appealed from the denial of declaratory judgment relief and from the refusal to grant attorney's fees. The County appealed the judgment denying its power to regulate Du ROI before September 1, 1983. The Attorney General of Texas appeared and participated to defend the constitutionality of *TEX.REV.CIV.STAT. ANN. art. 6626a* (Vernon 1969).

■ *Article 6626a,* as amended by the Acts of 1961, effective June 17, 1961, is a logical threshold statute. *Article 6626a,* as originally enacted in 1957, vested definite powers in the commissioners court concerning construction of streets or roads in subdivisions outside of corporate limits. The commissioners were also empowered to require adequate drainage in accordance with standard engineering practice as well as, a

bond for performance. The 1957 enactment of *art. 6626a* provided that Home Rule cities could regulate and restrict subdivisions within a 5 mile radius of their corporate limits. But in that same statute the legislature also found that there were no adequate laws giving supervision to subdivisions outside the corporate limits of a city.[1] We hold that it was the legislative intent and, indeed, the legislative mandate that concurrent jurisdiction was granted to the counties and the cities in the supervision of subdivisions outside the corporate limits but within a 5 mile radius thereof.

The 1961 amendment to *art. 6626a*, in relevant part, simply provides that the Act, as amended, "does not limit the requirement of prior approvals of plats by cities".[2] We hold that a prior approval also contemplates a subsequent approval. The subsequent approval would necessarily be by the counties. Hence, the only logical, sound, deducible conclusion is that the counties must also have concurrent jurisdiction of subdivisions outside of cities. We so hold. This holding applies to *art. 6626a* as it existed in 1957 and after it was amended in 1961.

*Article 6626a* with the 1961 amendment dictates, in mandatory commandments, every owner of land who divides land in two or more parts in *any* subdivision outside the corporate limits, *shall* cause a plat to be made which *shall* accurately describe all of the said subdivision in detail. Further, such plat *shall* be duly acknowledged by the owners or some agent and *shall* be filed for record and be recorded in the office of the County Clerk. A bond *shall* be made conditioned that the owners will construct the roads according to County's specifications. The commissioners court *shall* have the authority to refuse approval of substandard plats. The provisions of this article (art. 6626a) *shall* control and be effective (in case of conflict with other laws). These repetitive, mandatory, obligatory, affirmative, and dutiful *"shall"* provisions set out in Sections 1, 2, 3, 4, and 5

of *art. 6626a*, we find, clearly express the legislative intent. They empower the commissioners court with concurrent, mutual jurisdiction involving subdivisions outside city limits but within the 5 mile zone. We are compelled to this holding especially where, as here, the City had not acted, nor had been approached. Neither King nor Du ROI approached the City. Neither King nor Du ROI obtained the City's approval of "The Wilderness". King unequivocally admitted the same.

*Article 6626a*, as amended in 1961, and *art. 974a*, as amended in 1975 and 1981, are harmonious, compatible and complimentary when properly construed. They permit and, indeed, require that counties have concurrent jurisdiction with the cities concerning subdivisions outside the city limits but within the 5 mile zone. There is nothing in the language of either statute which indicates a legislative intent to create exclusive jurisdiction in the cities concerning subdivisions outside of their boundaries but within a 5 mile radius thereof. *Article 974a* addresses the needs of cities. *Article 6626a* addresses the needs of counties.

### Rules of Statutory Construction

The paramount rule for statutory construction is set out clearly in *Eddins-Walcher Butane Company v. Calvert*, 156 Tex. 587, 298 S.W.2d 93 (1957), where the holding and rule was announced in the following language:

> "Every word of a statute is presumed to have been used for a purpose, and a cardinal rule of statutory construction requires that each sentence, clause, phrase and word be given effect if reasonably possible.... This rule is not altered by the fact that the Legislature has not defined a particular word or phrase, and in the absence of such a definition the words of the enactment will usually be given their ordinary meaning...."

Generally laws relating to the same subject should be construed as though they were

---

1. Act of June 6, 1957 (55th Legislature), Ch. 436, sec. 7, 1957 Tex.Gen.Laws 1303.

2. Act of June 17, 1961 (57th Legislature), Ch. 449, sec. 2, 1961 Tex.Gen.Laws 1023.

incorporated in the same act. If these laws can be harmonized and effect given to each such law or article when so construed then there is no repeal by implication. Repeals by implication are not favored. We deem the proper construction of these statutes, *arts. 974a, 6626a,* and *6626,* is to harmonize them and give effect to each when it is reasonable to do so. We find it reasonable. *Gordon v. Lake,* 163 Tex. 392, 356 S.W.2d 138 (1962); *see also Conley v. Daughters of the Republic,* 106 Tex. 80, 156 S.W. 197, 157 S.W. 937 (1913). We quote from *Conley, supra,* 156 S.W. at page 201:

> "... hence, if repealed, it must be by implication, which is not favored. The two laws relate to the same subject, and should be considered as if incorporated into one act. If being so considered the two can be harmonized and effect given to each, there can be no repeal. *Neill v. Keese,* 5 Tex. 23, 51 Am.Dec. 746. 'There [sic] statutes, being *in pari materia,* and relating to the same subject, are to be taken together and so construed, in reference to each other, as that[,] if practicable, effect may be given to the entire provisions of each. * * * Thus considered, there is no repugnancy between the provisions of these statutes. They may stand together, and effect may be given to the entire provisions of each. And thus to construe and give effect to them, is in accordance with the established rule of construction.' *Brown v. Chancellor,* 61 Tex. 438 [sic]."

There is a separate opinion on the motion for rehearing in *Conley v. Daughters of the Republic* reported at 157 S.W. at page 937, and from the second opinion we quote:

> "It is the duty of this court to so construe the laws that both can stand, if fairly susceptible of such construction."

Our reasoning, we maintain, is harmonious with the reasoning in *Trawalter v. Schaeffer,* 142 Tex. 521, 179 S.W.2d 765 (1944). We have adhered to these rules of statutory construction in construing *art. 974a, art. 6626* and *art. 6626a* and hold that under this record the Commissioners Court of Montgomery County was not di-

vested of concurrent jurisdiction over "The Wilderness". This holding is correct because *art. 6626a* was enacted in 1957 and amended in 1961; whereas, the last amendment to *art. 6626* was enacted in 1951.

■ To construe these statutes otherwise would allow the undesirable results that have taken place in this case; namely, the replatting of parts of a subdivision, the renumbering of tracts in the subdivision without the consent of the owner and the rendering of duplicate ad valorem tax statements on the same tract of land for the same year. None of these could have been the intention of the Legislature. We cannot ignore the well-established presumption that when construing a statute the Legislature's choice of words is important and each and every word has significant meaning and purpose. *See Riverside Nat. Bank v. Lewis,* 603 S.W.2d 169 (Tex. 1980). *See also Jessen Associates, Inc. v. Bullock,* 531 S.W.2d 593 (Tex.1975).

Constitutional Grant of Power

*TEX. CONST. art. V, sec. 18,* in relevant part, provides:

> "The County Commissioners so chosen, with the County Judge as presiding officer, shall compose the County Commissioners Court, which shall exercise such powers and jurisdiction over all county business, as is conferred by this Constitution and the laws of the State, or as may be hereafter prescribed."

Following that constitutional grant of power the Legislature enacted *TEX.REV.CIV. STAT.ANN. art. 2351* (Vernon 1971) which provides, in relevant part:

> "Each commissioners court shall:
>
> ....
>
> "6. Exercise general control over *all roads,* highways, ferries and *bridges* in their counties." (Emphasis added)

■ No subdivider could thwart the constitutional grant of power or the consistent legislative intention to repose into the commissioners court the duties and authority to control and regulate the roads and bridges in their respective counties. In

construing *TEX. CONST. art. V, sec. 18* with *art. 2351*, we hold that they conveyed to the commissioners court ample authority and full power to do all things necessary to bring about and fully accomplish the objectives of the grant of power. *See Terrell v. Sparks,* 104 Tex. 191, 135 S.W. 519 (1911). *See also West v. Ellis County,* 241 S.W.2d 344 (Tex.Civ.App.—Waco 1951, no writ). We find this clear holding in *Terrell v. Sparks, supra,* 135 S.W. at 521:

> "... For the rule of construction by which we are to be governed, we copy from Sutherland on Statutory Construction, sec. 341, as follows: 'Whenever a power is given by statute, everything necessary to make it effectual or requisite to attain the end is implied. It is a well-established principle that statutes containing grants of power are to be construed so as to include the authority to do all things necessary to accomplish the object of the grant. The grant of an express power carries with it by necessary implication every other power necessary and proper to the execution of the power expressly granted. Where the law commands anything to be done, it authorizes the performance of whatever may be necessary for executing its commands.'"

### Attorney Generals' Opinions

Although we have carefully considered and weighed all of the attorney generals' opinions that were submitted to us, we find them in conflict. They are certainly not harmonious. In view of this, there is added impetus on us to construe the relevant statutes anew and afresh. This we have done.

### Equitable Estoppel

■ Since it is admitted by King, both for himself and his corporation, Du ROI, that he did not at any time approach the City of Conroe or any of its officers or governing bodies concerning the approval by the City of his subdivision, "The Wilderness", and since, therefore, the City of Conroe never acted, nor was ever asked to act, nor was ever approached about the plat of the subdivision known as "The Wil-

derness"; therefore, we hold that R.V. King and his corporation are estopped equitably from arguing and urging that the City of Conroe had *exclusive jurisdiction in the 5 mile extra-territorial zone.*

### Du ROI's Attorney's Fees

■ The trial judge committed no error when he refused attorney's fees to La COUR Du ROI, INC. We think his action was correct in the first instance because he did not award La COUR Du ROI, INC., a judgment based on the Uniform Declaratory Judgments Act. Nevertheless, *TEX. REV.CIV.STAT.ANN. art. 2524–1* (Vernon 1965 and Vernon Supp.1985) certainly reposes in the trial judge broad discretion in the matter of attorney's fees. *TEX.REV. CIV.STAT.ANN. art. 2524–1, sec. 10* (Vernon Supp.1985) provides as follows:

> "In any proceeding under this Act [Declaratory Judgments Act] *the Court may make such award* of costs and reasonable and necessary attorney's fees *as may seem equitable and just.*" (Emphasis added)

The trial judge's judgment or final decree states, in relevant part:

> "The Court further concluded that it is unnecessary to render any declaratory judgment respecting the validity of any of the statutes in controversy *and that it would not be equitable or just to award attorney's fees to Defendant. ...*" (Emphasis added)

The statute requires the fees to be equitable and just in the mind of the trial court. Under this unusual record, the trial judge had ample reason and discretion to find that the awarding of attorney's fees would not be equitable. Since injunctive relief was involved, the proceeding below was in equity. Under our blended system of law and equity, the court could and doubtlessly did apply the doctrines, either singularly or collectively, of clean hands, balancing the equities and other well-known and well-established cardinal principles of the equity practice. Under this entire record the trial judge, sitting as a chancellor in equity as the keeper of the

sovereign's conscience, could and did properly deny Du ROI's attorney's fees. This same reasoning and rationale would apply as to whether the awarding of attorney's fees would be just. The trial judge, well within his prerogative and discretion, decided that it would not seem equitable and just. We affirm the trial court's action in denying the award of attorney's fees to Du ROI.

### Inadequately Developed Issues

Du ROI urged that its rights had been violated, arguing that it had been singled out for unfair treatment. We think these issues were not adequately developed. They may be important as equitable defenses since the county sought equitable relief. The doctrine of balancing the equities and the doctrine of clean hands may become relevant. There was more than a scintilla of evidence to show that the father of a county-wide elected official was alleged to have developed an unrecorded subdivision as well as the husband of the secretary of the elected official. Further, reviewing the whole posture of the case, we perceive that the City of Conroe was a proper party to the litigation and may well have been a necessary party. R.V. King may be a necessary party also.

An order had been entered in this appeal concerning the problem of overburdening this record. That order was improvidently granted. It is set aside. We have examined the entire record.

### Estoppel by Deed or Estoppel by Written Legal Instrument

We have examined in excess of 40 contracts for the sale of land, general warranty deeds, and conveyances. In virtually every one of these written legal instruments we find such language as:

"5. Furthermore, any mobile homes on this land will be kept concealed from passersby on the public road and from neighbors;

. . . .

"12. ... This land and the public road in front of this land shall be kept free of litter or trash."

These "covenants and conditions are imposed as conditions running with the land on the property described ..." and are serious, written recitals, covenants and conditions. They, themselves, constitute strong, probative, primary evidence. These types of covenants and conditions have been characterized as a type of absolute estoppel. They arise from instruments of legal dignity; indeed, from the deeds, themselves, and from the contracts for the sale of land. Therefore, both King and La COUR Du ROI, INC., are firmly and finally estopped from taking the position that the roads in question are not public roads.

The learned, able trial court certainly committed reversible error in this regard. *See Kimbro v. Hamilton*, 28 Tex. 560 (1866); *Havard v. Smith*, 13 S.W.2d 743 (Tex.Civ.App.—Beaumont 1929, no writ); *Elliott v. Langham*, 60 S.W.2d 287 (Tex. Civ.App.—Waco 1933, no writ).

For the reasons, findings and holdings set out above, we reverse the judgment and remand the whole cause for a new trial on the entirety of the cause of action consistent and harmonious with this opinion. And as an additional, separate and independent basis for our decision, we reverse the judgment and remand the entire cause for a new trial because some of the important issues in the case were not adequately or fully developed. Having found reversible error, and as an additional, separate and independent basis for our decision, we reverse and remand in the interest of justice.

**REVERSED AND REMANDED.**