**CITY OF HOUSTON, et al, Appellants,**

v.

**HARRIS COUNTY OUTDOOR ADVERTISING ASSOCIATION, et al, Appellees.**

**No. A14–86–901–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

May 7, 1987.

Rehearing Denied June 4, 1987.

See also, 732 S.W.2d 370.

John M. Schiltz, Austin, Paul R. Bibler, Jr., Gilbert D. Douglas, Monroe Northrop, Houston, for appellants.

Richard L. Rothfelder, Philip P. Sudan, Jr., A. Andrew Gallo, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and ROBERTSON and CANNON, JJ.

## OPINION

ROBERTSON, Justice.

This appeal is from a declaratory judgment affecting the regulation of billboards in and around the City of Houston. Appellants, defendants in the trial court, are the City of Houston (City), the Municipal Board on Sign Control of the City of Houston (Board), the Board's individual members, and the State of Texas. Appellees, plaintiffs in the trial court, are a trade association of various outdoor advertising businesses and their individual members. Issues before us concern: (1) the interpretation and application of the federal sign statute, the state sign statutes, and the local sign code; (2) the constitutionality of a portion of a state sign statute; and (3) attorneys' fees. We reverse the judgment of the trial court and render judgment that appellees take nothing.

Currently, the Houston area sign industry is subject to at least four means of federal, state, and local regulation: (1) the Highway Beautification Act of 1965, 23 U.S.C. § 131 (1983) (HBA); (2) the Texas Litter Abatement Act, art. IV "Highway Beautification," Tex.Rev.Civ.Stat.Ann. art. 4477–9a (Vernon Supp.1986) (TLAA); (3) Tex.Rev.Civ.Stat.Ann. arts. 1015o, 1015o –1 (Vernon Supp.1986) (H.B.1330); and (4) Houston Uniform Building Code ch. 46 (Sign Code).

Federal regulation of outdoor advertising began with the Federal-Aid Highway Act of 1958. Under this voluntary act, participating states could elect to control signs by exercising their police power or by exercising their right of eminent domain.

Thereafter, Congress enacted the HBA. Since enactment, the HBA has been amended numerous times. The current federal law is voluntary and provides for the effective control of signs within federal corridors (areas within 660 feet of the edge of interstate and federal aid primary system rights-of-way). In states that elect to com-

ply, the HBA requires a state-federal control agreement to define the state's commercial and industrial zone exemption. In those states, billboards may only be permitted in commercial and industrial zones, subject to compliance with spacing and other terms of the state-federal agreement. New billboards may not be erected outside industrial and commercial zones, and existing ones that fail to comply with the location or spacing requirements are to be purchased and removed. Further, the HBA provides that "just compensation" (presumably cash) must be paid when signs are removed as a result of federal law or when they are removed as a result of some other action, including compliance with state or local law. The states retained the right to impose stricter regulations, subject to the retention of the compensation requirement of the HBA.

In 1972, the Texas Legislature enacted the Texas Highway Beautification Act to comply with the HBA. The state act, later codified as part of the TLAA provides that no signs, except certain exempt signs, can be erected or maintained within 660 feet of the nearest edge of the rights-of-way of the federal corridors. Further, the TLAA provides that the state will pay compensation for the state's taking of all right, title, leasehold, and interest in the signs and, if appropriate, for its taking from the owner or lessees of the properties where the signs are located. Finally, the TLAA provides that a political subdivision of the state can issue permits to control the erection and maintenance of signs, and these permits will be accepted in lieu of the state permits required under the TLAA, provided that the erection and maintenance of the outdoor advertising is in compliance with the TLAA and the rules of the Texas Highway Commission adopted pursuant to the TLAA.

Pursuant to the HBA, the State of Texas and the federal government entered into an agreement on May 2, 1972. The agreement defines an unzoned commercial or industrial area as being within 800 feet of one or more recognized commercial or industrial activities, subject to certain exceptions. Further, the state agrees to exercise effective control over the billboards in industrial areas by regulating the size, lighting, and spacing of billboards in these areas. The state can discharge its duty of effective control by certifying that local governmental units have established criteria regarding size, lighting, and spacing consistent with the purposes of the HBA.

In 1980, the city enacted the Sign Code, a comprehensive ordinance which regulated the erection and maintenance of many different types of outdoor advertising, including billboards. In addition to prohibiting new billboard construction, the Sign Code regulated the height, size, and location of billboards. At that time, the owners of existing signs that did not conform to the height, size, and location requirements were provided a six-year amortization period to allow the affected signs to come into compliance with the requirements of the Sign Code. The city adopted the state spacing regulations, but otherwise applied the provisions of the Sign Code to those signs in the federal corridors. The net result was to exempt any federal corridor billboard from *removal* under the six-year amortization rule because of the HBA requirement of payment for removal. However, billboards located within the federal corridors, that could conform to the ordinance without removal remained subject to modification to meet height and size requirements at the expiration of the six-year amortization period. Billboards that were not located within the federal corridors were subject to all of the height, size, and location regulations contained in the Sign Code. Because the HBA and TLAA only apply within the federal corridors, any billboard located elsewhere which did not comply with any applicable requirement of the Sign Code would have to be altered to conform or removed upon the termination of the six-year amortization period.

After its passage, the Sign Code was the subject of a broad-based attack upon its constitutionality by a group of portable sign owners. *Sign Supplies of Texas, Inc. v. McConn*, 517 F.Supp. 778 (S.D.Tex.1980), *aff'd by order*, (5th Cir. July 13, 1981). The ordinance survived this attack and was

held to be constitutional. In addition, the Sign Code was found not to conflict with the TLAA or the HBA.

In both 1983 and 1985, the billboard industry urged bills to nullify the amortization provisions contained in the Sign Code. In 1985, a compromise resulted in the passage of H.B. 1330. As part of this compromise, the use of methods other than cash compensation for the removal of nonconforming signs is limited to those cities that already have sign control ordinances which provide for amortization. In those cities that have passed ordinances providing for amortization, the signs are to be divided into two groups. The first group includes all signs that can be brought into compliance with the local ordinance at a cost of "15 percent or less" of the signs value. The sign owners are required to submit a list of these "15 percent or less" signs to a municipal sign board created pursuant to H.B. 1330. The municipal sign board *can*, after consultation with the sign owners, require that one-half of these "15 percent or less signs" be brought into compliance (one-third each year by July 1, 1986, 1987, and 1988). The other one-half of these signs will be permitted to remain without alteration as "grandfathered" nonconforming signs. The second group, all signs which cannot be brought into compliance at a cost of 15 percent or less of their value, the sign board will determine their useful life and an amortization period. Additionally, cities are given the right to extend their sign control ordinances into their areas of extraterritorial jurisdiction (ETJ). In the case of the City of Houston, this area contains all land within five miles of the city limits and not within another incorporated city or the exclusive ETJ of another city.

Almost immediately after its enactment, the city moved to implement the provisions of the H.B. 1330. The city passed Houston, Tex., Ordinance 85–799, which extended the application of the Sign Code to the ETJ. This ordinance modified various sections of the 1980 Sign Code and added several new sections relating to the ETJ and H.B. 1330. The current Sign Code was adopted on February 4, 1986, in conjunction with a general recodification of the City's Building Code, by Houston, Tex., Ordinance 86–142.

Pursuant to Sign Code § 4616, the Board proceeded to implement the provisions of H.B. 1330 art. 1, § 6 by supplying the sign companies a list of all billboards found to be non-conforming. The Board then requested from the billboard owners a list of all signs located within the city and its ETJ that could be brought into compliance with the Sign Code at 15 percent or less of their value. The lists that the billboard owners submitted to the Board contained a number of signs, including signs located in the federal corridors, that could be brought into compliance by modification or removal at 15 percent or less of their value. Additionally, the Board determined the "useful life" of signs in the second group, the over 15 percent signs, as seventeen years for wooden pole signs and twenty-one-and-one-half years for steel pole signs.

At this stage of the Board's implementation proceedings, various members of the local billboard industry filed this suit in the District Court of Harris County seeking declaratory relief. At the time the suit was filed the Board had not requested the alteration or removal of any signs, whether in a federal corridor or elsewhere, under the "15 percent or less" signs provisions. Further, the "over 15 percent" signs were several years from any required compliance. This suit effectively halted the implementation process. Therefore, the signs that would have been scheduled for compliance by July 1, 1986, were never specified or directed to be brought into compliance.

At the conclusion of the hearing for declaratory judgment, the trial court granted the sign owners (appellees) significant relief. The trial court judgment basically provided:

(1) the Houston Sign Code is inapplicable to signs located adjacent to the federal interstate and primary highways. Instead, the State of Texas has the non-delegable duty to regulate these types of signs;

(2) the amortization procedure of Article 1, Section 6 of H.B. 1330 is inapplicable to federal corridor billboards;

(3) the term "useful life," which is integral to H.B. 1330's amortization procedure, is void for vagueness;

(4) certain interpretations by the city's administrators of the Sign Code are invalid;

(5) plaintiffs are entitled to bring all of their signs which fail to comply with the size and cutout provisions of the Houston Sign Code into conformance with the Code in accordance with H.B. 1330's amortization procedures, rather than immediately as required by the City;

(6) Ordinance No. 85–799, which was adopted by the Houston City Council on May 29, 1985, and purported to extend the code into Houston's extraterritorial jurisdiction, is void ab initio because it was adopted too soon; and

(7) plaintiffs are entitled to substantial attorney's fees, with added sums for appeals, and court costs.

In their first five points of error appellants contend the trial court erred in concluding that Sign Code §§ 4605(e)(2)(iv), 4612(b) and 4609(f) are inapplicable to billboards in the federal corridors and that the TLAA applies in lieu thereof.

■ In its judgment the trial court concluded:

A. the provision of Chapter 46 of the Houston Uniform Building Code ("Houston Sign Code") requiring sign companies to bring non-conforming signs into compliance with its height, location and size limitations [§ 4605(e)(2)(iv)] does not apply to Plaintiffs' outdoor advertising structures ("signs") located along the federal primary and interstate highway system and within six hundred and sixty feet of the nearest edge of the right-of-way and visible from the main traveled way of the system ("Federal Highway Signs");

B. the Houston Sign Code's prohibition on the issuance of new construction permits for off-premise signs [§ 4612(b)] does not apply to construction permits for new off-premise signs in commercial and industrial areas located along the federal primary and interstate highway system and within six hundred and sixty feet of the nearest edge of the right-of-way and visible from the main traveled way of the system; and

C. the Houston Sign Code's provision which includes cutouts in determining a sign's face size [§ 4609(f)] does not apply to Federal Highway Signs.[1]

The State Highway and Public Transportation Commission regulations promulgated pursuant to the Texas Litter Abatement Act [codified at Tex.Rev.Civ. Stat.Ann. art. 4477–9a], shall apply in each of the instances mentioned in A., B. and C. above.

Further, the trial court designated, and appellees now contend, the following finding of fact as determinative of this issue:

since Houston is an "unzoned commercial and industrial area," the State can discharge its obligation to "effectively control" federal highway signs in Houston *only* by enforcing the provisions of the Agreement, the TLAA and regulations promulgated thereunder. The State may not simply certify that the City has established and will enforce within its geographical jurisdiction sign regulations consistent with the HBA and customary use.[2]

In other words, the Sign Code is totally inapplicable to billboards in federal corridors. Although the trial court designates this as a finding of fact, it is really a conclusion of law and, as such, we are not bound by it. *See Adams v. American Quarter Horse Ass'n,* 583 S.W.2d 828 (Tex. Civ.App.—Amarillo 1979, writ ref'd n.r.e.). We do not agree with either appellees' contention or the conclusion reached by the trial court.

---

1. Cutouts are temporary facing extensions or artistic embellishments projecting beyond the dimensions of the rectangular signboard.

2. Emphasis added unless otherwise noted.

■ Neither the trial court nor the appellees address the fact that Houston is a home rule city. As stated by the supreme court in *Lower Colorado River Authority v. City of San Marcos*, 523 S.W.2d 641, 643 (Tex.1975):

A home rule city derives its power not from the Legislature but from Article XI, Section 5, of the Texas Constitution. Accepting cities and towns of more than 5,000 population have "full power of self-government, that is, full authority to do anything the legislature could theretofore have authorized them to do. The result is that now it is necessary to look to the acts of the legislature not for grants of power to such cities but only for limitations on their powers." *Forwood v. City of Taylor*, 147 Tex. 161, 214 S.W.2d 282 (1948). Where Article 1175 indicates that a power is to be exercised by the "governing authority" or specifies the procedure to be followed, the statutory provisions may be regarded, in some instances at least, as limitations on the power to other officials or act in any other manner. *See Burch v. City of San Antonio*, Tex.Sup. (1975), 518 S.W.2d 540. In view of the explicit provisions of Article 1176, however, the enumeration of powers of Article 1175 may never be construed as an implied limitation on the exercise by a home rule city of all powers incident to the enjoyment of local self-government.

Therefore, the city may enact any ordinance which is not inconsistent with the Constitution or laws of Texas. *McDonald v. City of Houston*, 577 S.W.2d 800 (Tex. Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.).

Section 131(k) of the HBA specifically provides that "nothing in this section shall prohibit a State from establishing standards imposing stricter limitations with respect to signs ... on the Federal-aid highway systems than those established by this section." The Texas Legislature passed the TLAA to comply with the HBA. Consistent with the federal act, the TLAA authorized the State Highway and Public Transportation Commission to adopt rules to regulate signs. The state regulations allow political subdivisions of the state to exercise control over outdoor advertising signs. Further, Tex.Rev.Civ.Stat.Ann. art. 1175, § 24 specifically authorizes home rule cities to "license, regulate, control or prohibit erection of signs or bill boards *as may be provided by the charter or ordinance*." Finally, Sign Code § 4604(c)(6) specifically authorizes the sign administrator to enforce the TLAA, the agreement between the United States Department of Transportation and the Texas Department of Highways and Public Transportation, and all rules and regulations promulgated thereunder "with regard to signs."

■ Clearly, the HBA and the TLAA establish *minimum* regulations for the outdoor advertising business. Together, they do not prevent, but rather leave the door open and encourage stricter regulation by other governmental agencies in the lawful exercise of their power. The Sign Code in no way conflicts with or negates any provisions of either the federal or state highway beautification acts. *Sign Supplies v. McConn*, 517 F.Supp. at 785. In the absence of express limitations, there is nothing that prevents a city from enacting an ordinance covering the same subject as state or federal regulations. *Prescott v. City of Borger*, 158 S.W.2d 578 (Tex.Civ. App.—Amarillo 1942, writ ref'd). The conclusion that the Sign Code does not apply to federal highway signs is therefore in error. Appellants' fifth point of error is sustained.

In their sixth through thirteenth points of error appellants contend the trial court erred in concluding that the Board had incorrectly included appellees' signs within the federal corridors in the list of signs subject to the amortization provisions of H.B. 1330.

The complained of portion of the judgment provided that the court:

ORDERS, ADJUDGES AND DECLARES that the Municipal Board on Sign Control of the City of Houston has incorrectly included Plaintiffs' Federal Highway Signs on the lists of signs compiled pursuant to the requirements of

Article 1, §§ 6(b) through (e) of H.B. 1330 [codified at *Tex.Rev.Civ.Stat.Ann.* art. 1015o (6)(b) through (e)].

In his findings of fact, which he designated as supporting this conclusion, the trial judge found:

(1) HBA requires just compensation for the "removal" of federal highway signs;

(2) Congress intended the just compensation to be a cash payment;

(3) TLAA provides if the commission "takes" a federal highway sign "just compensation" will be paid;

(4) the Texas legislature intended to prohibit amortization of federal highway signs;

(5) the City of Houston is bound to pay "just compensation" for the "taking" of federal highway signs; and

(6) the city council did not intend for the amortization provisions of the Sign Code to apply to federal highway signs.

Again, these findings of fact are really conclusions of law. It is clear in finding that the intent of the Texas Legislature and the city council was to exclude the federal highway signs from the amortization plan, the court relied upon the testimony of the House sponsor of H.B. 1330 and several past and present members of the city council, each of whom testified to their intent and the intent of the legislative body of which they were a member. This type of evidence has been held to be improper. *Commissioners Court of El Paso County v. El Paso County Sheriff's Deputies Association*, 620 S.W.2d 900 (Tex.Civ.App.— El Paso 1981, writ ref'd n.r.e.).

H.B. 1330 art. 1, § 5 provides several methods of compensation for the cost of relocation, reconstruction, or removal *of any sign* within the corporate limits or ETJ of cities. However, article 1, section 6 of H.B. 1330 provides that if, on June 1, 1985, a municipality has in effect an ordinance requiring the relocation, reconstruction or removal of any sign and the ordinance provides for the compensation of a sign owner under an amortization plan, "the compensation for a sign's relocation, reconstruction,

or removal is to be determined under this section instead of under Section 4 of this article." Additionally, the act requires the municipal board on sign control to compile a list of all signs that do not comply with the local sign ordinance and give notice to the owners. The sign owners are then required to file with the board a list of his signs that he (the owner) determines can be brought into compliance with the sign ordinance at a cost of 15 percent or less of the value of the sign and also a list of the signs that cannot be brought into compliance at such cost. The act further provides that of the signs that can be brought into compliance at a cost of 15 percent or less, the owner can keep one-half as nonconforming signs; however, the other one-half must be made to conform at no cost to the city (one-third of the signs each year by July 1, 1986, 1987, and 1988).

▆ It was apparently the view of the trial court that since the HBA requires just compensation for the *removal* of a sign, the city is powerless to *regulate* the federal highway signs in any manner, unless it pays cash compensation. We do not agree.

As stated earlier, the HBA expressly authorizes states to impose stricter regulations on signs in the federal corridors. H.B. 1330, without question, attempts to accomplish this purpose. While appellants concede that they could not use any provision of H.B. 1330 art. 1, § 6 to require the *removal* of a federal corridor billboard without cash compensation, they assert, and we agree, there is nothing in the HBA or the TLAA precluding the Board from initiating actions not tantamount to removal. Even the trial court conceded appellants could take various actions, including that of requiring a reduction in size or height of the sign, as opposed to being removed, or designating the federal corridor signs in the one-half of the 15 percent or less signs allowed to remain as nonconforming, without violating the "just compensation" requirement of the HBA.

▆ Finally, it is also clear that Texas has joined the prevailing view of outside jurisdictions by recognizing the amortiza-

tion technique as a valid exercise of municipal police power to terminate nonconforming property uses. *City of University Park v. Benners*, 485 S.W.2d 773 (Tex. 1972). There, the court stated:

> that such an enactment is subject to the same test of validity as other legislative acts, i.e., whether it is reasonable and bears a fair relationship to the object sought to be obtained. If the ordinance passes constitutional muster as reasonable and bears a fair relationship to the object sought to be obtained, it does not constitute a "taking" of property in the eminent domain sense. Instead, it is a valid exercise of municipal police power.

*Id.* at 777–78. It was upon this basis that an amortization plan to bring nonconforming billboards into compliance with a city ordinance was upheld in *Lubbock Poster Co. v. City of Lubbock*, 569 S.W.2d 935 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979). It therefore appears clear that appellants, through the use of their police powers, can require the removal of signs not in the federal corridors. It has even been held that federal and state highway beautification acts do not restrict a city's use of police power to terminate nonconforming signs. *See Art Neon, Inc. v. City and County of Denver*, 488 F.2d 118 (10th Cir.1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *E.B. Elliott Advertising Co. v. Metropolitan Dade County*, 425 F.2d 1141 (5th Cir.), *pet. dismissed*, 400 U.S. 805, 91 S.Ct. 12, 27 L.Ed.2d 12 (1970). We therefore find the broad conclusion of the trial court in error. Appellants' thirteenth point of error is sustained.

In their fourteenth and fifteenth points of error appellants contend the trial court erred in finding the term "useful life" contained H.B. 1330 void for vagueness.

In its judgment the trial court declared: the term "useful life" contained in Article 1, § 6 of H.B. 1330 violates the due process clauses of the Texas and United States Constitutions and, therefore, is void for vagueness because (i) it fails to provide fair and adequate notice and

meaning of the term and (ii) it subjects Plaintiffs to the unbridled discretion of non-elected officials.

In its findings of fact, which it stated were in support of this conclusion, the trial court determined:

(1) H.B. 1330 contains no definition of or objective standards for determining "useful life"; and

(2) The term "useful life" is not certain and definite enough so that men of common intelligence will not have to guess at its meaning or differ as to its application.

In his additional findings of fact the court stated:

> Additionally, H.B. 1330 does not provide sufficiently explicit standards for those who will apply it, therefore, it encourages "arbitrary and discriminatory enforcement."

Again, it is readily apparent these "findings" are not findings of fact, but conclusions of law.

The challenged portion of H.B. 1330, art. 1, § 6(h) provides:

> For signs that the board verifies cannot be brought into compliance at the cost of 15 percent or less, the board shall determine the entire useful life of those signs by type of category, such as he categories of mono-pole signs, metal signs, and wood signs. The useful life may not be solely determined by the natural life expectancy of a sign.

■ "In passing upon the constitutionality of a statute, we begin with a presumption of validity. It is to be presumed that the Legislature has not acted unreasonably or arbitrarily, and the burden is on one who challenges an act to establish its unconstitutionality." *Robinson v. Hill*, 507 S.W.2d 521 (Tex.1974). A statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct. *Rowan v. United States Post Office Department*, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970); *Texas Liquor Control Board v. Attic Club, Inc.*, 457 S.W.2d 41 (Tex.1970).

■ While H.B. 1330 contains a provision for civil and administrative penalties, it creates no penal offenses. It is a statute designed to allow the regulation of the billboard industry. The strict rules under which the constitutionality of penal statutes are tested are not so rigidly applied when passing upon regulatory statutes. This principle is amply demonstrated by the supreme court in *Pennington v. Singleton*, 606 S.W.2d 682 (Tex.1980), where the court held the Texas Deceptive Trade Practices-Consumer Protection Act constitutional. There, the court stated:

> We first note that in the field of regulatory statutes governing business activity, greater leeway is allowed in applying the fair notice test. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). As stated by the United States Supreme Court in *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952): "Most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded." Statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language. *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963). The statute should "convey sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Petrillo*, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947).

*Id.* 606 S.W.2d at 689. Further, the requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas that find adequate interpretation in common usage and understanding. *City of Webster v. Sign Ad, Inc.*, 682 S.W.2d 644, 647 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

■ While we agree that the term "useful life" could, under some circumstances, be vague, we do not regard it as vague when used in connection with taxation, depreciation of assets, and amortization. *See Massey Motors, Inc. v. United States*, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960) ("useful life is measured by the use in the taxpayer's business, *not by the full abstract economic life of the asset in any business.*"); *Richard S. Miller & Sons, Inc. v. United States*, 537 F.2d 446, 210 Cl.Ct. 431 (1976) ("Useful life" for depreciation purposes is an estimate, and the length of the useful period must be shown by evidence that allows it to "be estimated with reasonable accuracy." The law does not demand "[e]xtreme exactitude in ascertaining the duration of an asset."). We therefore do not agree that "useful life" is vague in the context with which it is used in H.B. 1330.

H.B. 1330 establishes a municipal sign board and mandates that it be composed of: (1) two persons who must be real estate appraisers registered with the Society of Real Estate Appraisers or the American Institute of Real Estate Appraisers; (2) one person who must be engaged in the sign business in the municipality; (3) one person who must be an employee of the State Department of Highways and Public Transportation and must be familiar with real estate valuations in eminent domain proceedings; and (4) one person who must be an architect or a landscape architect licensed by the state. Further, article 1, section 6(e) of H.B. 1330 provides that in verifying the owner's determination of which signs can be brought into compliance, the Board may not make any determination until the owner "is given an opportunity for a hearing before the board about the issues involved in the matter." Finally, H.B. 1330 art. 1, § 7 provides that any person aggrieved by a decision of the board may appeal to the district court by writ of certiorari. This not only provides for the decision to be made by a board composed of extremely qualified persons, but assures the right of appeal to further guarantee uniformity.

It appears appellees disagreement is not so much with the definition of the term "useful life," but with the Board's determination of what the useful life is. Appellees may be somewhat in the same position as the billboard owners in *Grant v. Mayor and City Council of Baltimore*, 212 Md. 301, 129 A.2d 363 (1957). There, billboard owners challenged the constitutionality of a five-year amortization provision. The court concluded:

A corporation that has regularly, year by year, acted in its financial affairs, under the oath of its authorized officers (and penalty of perjury), on the premise that the full useful life of its billboards is five years is handicapped seriously in arguing persuasively that legislative reliance on that same premise has done it a constitutional wrong—has taken from it substantial property without compensation—by banning the further use of those billboards.

*Id.* at 372.

The trial court erred in finding the term "useful life" in article 1, section 6 of H.B. 1330 violated due process on the ground that it was void as being unconstitutionally vague. Appellants' fifteenth point of error is sustained.

In points of error sixteen through twenty appellants contend the court erred in concluding that the city is incorrectly interpreting certain sections of the Sign Code.

Specifically, that portion of the judgment:

ORDERS, ADJUDGES AND DECLARES that the City of Houston is incorrectly interpreting the Houston Sign Code's prohibition on the issuance of new construction permits for off-premise signs [§ 4612(b)] as prohibiting Plaintiffs from obtaining a permit to bring into compliance their signs violating the Code's setback [§ 4612(d)], spacing [§ 4612(c)(4)], proximity [§ 4612(c)(1)], residential district [§ 4612(c)(2)] and minimum clearance [§ 4612(g)] provisions, except through removal of those signs.

Before setting forth the "findings of fact," it is appropriate to quote those sections of the Sign Code to which the court's declaration pertains.

Section 4612 provides in part:

(b) Prohibition of New Off-premise Signs. From and after the effective date, no new construction permits shall be issued for off-premise signs within the sign code application area. This prohibition shall apply to all classifications of signs, types of signs, and special function signs, and all other signs used as off-premise signs.

(c) General Location. 1. All off-premise signs shall be located within 800 feet of a commercial or industrial activity. 2. No off-premise sign shall be located in a predominantly residential area.

．　　．　　．　　．　　．

4. All off-premise signs other than those located on the Interstate and Freeway Primary System shall be subject to the following spacing requirements from other off-premise signs on the same side of the public right-of-way (See also Table No. 4612):
A. No off-premise sign having a face area in excess of 300 square feet shall be located within 400 feet of another off-premise sign.
B. No off-premise sign having a face area of from 100 to 300 square feet shall be located within 200 feet of another off-premise sign.
C. No off-premise sign having a face area up to 100 feet shall be located within 100 feet of another off-premise sign.

．　　．　　．　　．

(d) Location on Property. All off-premise signs and sign structures shall be within the deeded front building line, or if no such line exists, within the property line, but in no event closer than 20 feet to the curb of any public street.

．　　．　　．　　．

(g) Visibility Triangle. Within the triangular areas shown below or within 45 feet of an intersection, no part of the face of an off-premise sign shall be

lower than a height of 8 feet above the grade level of the nearest street.

In its findings of fact supporting the above declaration, the trial court determined:

1. The city interprets § 4612(b) to prohibit the relocating or raising existing signs in order to bring them into compliance with the ordinance's requirements on setback, spacing proximity, residential district and minimum clearance provisions.

2. The city interprets the Sign Code as equating compliance with removal of signs violating the code's requirement.

3. The city determined that if the cost of compliance amounts to 15% or less of the signs value, the sign owner must include that sign in the list of signs, one-half of which have to be brought into compliance within three years.

4. The number of the signs required to be brought into compliance within three years total approximately 1660 signs, valued at approximately $50,000,000.

5. The intention of the city council in enacting Section 4612(b) of the sign code was to prohibit only the construction of new signs, not the remedial action required to bring existing signs into compliance with the code's provisions.

6. The city council intended that, at the end of the six year grace period, sign owners would only have to bring their signs into compliance with the code, not remove them.

7. The city council intended to require the removal of signs located in scenic and historic rights-of-way and districts at the end of the six year grace period.

8. The city council intended that Sec. 4605(c)(3) govern removing and reerecting signs to make them comply with the code.

9. In passing H.B. 1330, the legislature did not intend to prohibit the relocation or raising signs necessary to bring them into compliance with the code provisions.

As has been previously observed, findings 5 through 9 are not findings of fact, but conclusions of law. Presumably, the trial court designated them findings of fact based upon the erroneously admitted incourt testimony of the bill's sponsor and several past and present members of the city council. We are not bound by these conclusions of law and, again, we reject them.

It is a well established principle of law that if a statute or ordinance is plain and unambiguous, a court should give effect to its plain meaning. Recently, the supreme court again admonished the lower courts of this principle in *RepublicBank Dallas v. Interkal*, 691 S.W.2d 605 (Tex.1985). There, the court stated:

> Courts must take statutes as they find them. More than that, they should be willing to take them as they find them. They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language and not elsewhere.... They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain.

*Id.* at 607.

It is beyond dispute that Sign Code § 4612(b) prohibits the issuance of *new construction permits* for off-premise signs. It is also clear, as found by the court in the first finding of fact recited above (and admitted by appellants), that the city concludes a new construction permit is required in order to comply with the Sign Code *if a sign must be physically moved, either to a new location or raised in height above the ground level.* On the other hand, the evidence indisputably shows that the city issues a *reconstruction permit* if: (1) a billboard is being rebuilt *in place* following partial destruction, or (2)

the size of the face of the billboard is being reduced to comply with the code, or (3) if the billboard is lowered in height to comply with the code.

Appellants argue, and we agree, these positions are logically consistent because any physical movement of the sign to comply with the requirements of setback, minimum clearance, proximity to residential areas, or other locational requirements involve a dismantling of the billboard and erecting it elsewhere. There was extensive testimony that even moving a billboard a few feet to comply with setback requirements would involve taking down the entire structure and redoing the entire foundation. One of the witnesses explained the extent of this work in the following words:

> And, of course, your big money goes into foundation where you're erecting fairly good signs. These have to go 25 feet into ground with concrete casing around them. Because of the water table in this area we get 12 feet down in the dirt, and we hit water; and the hole starts to collapse in. The way to prevent the caving is encase it with steel and/or with drilling mud. We elected drilling mud, so the hole—and go down to 25 feet that the engineers requires to be sure the signs are structurally safe and would withstand higher winds.

There was also testimony that raising the height of a sign (as contrasted to lowering its height) involves the same principle of added foundation and structural support. Therefore, this distinction also has validity.

Sign Code § 4605(a) requires a written permit in order for any person to *erect, reconstruct, alter,* or *use* a sign in the sign code area. Section 4605(c)(3) provides that if the location, plans, and specifications in the application for the permit *conform to all other requirements of this chapter* the administrator shall issue the permit. Finally, section 4605(e)(3) provides that if "any sign or any substantial portion is destroyed or taken down or removed for any purpose other than maintenance operations or changing the letters, symbols or other matter on such sign, *it shall not be reerected,*

*reconstructed, repaired or rebuilt* except in full compliance with this chapter."

The trial court concluded that section 4605(c)(3) of the Sign Code "is to be interpreted to govern situations requiring the 'taking down' or 'removing' of signs and 'reerecting' or 'rebuilding' them, such as the situation where a sign owner has to take down and reerect at another location a sign in order to bring it into compliance with local sign regulations." We do not agree with this conclusion in view of the plain meaning of sections 4605(a), 4605(c)(3), and 4605(e)(3).

We do not find the Sign Code ambiguous. However, even if the meaning of the act is unclear, well settled rules of statutory construction require the interpretation used by the administrative agency charged with its implementation to be given great weight. *Ex parte Roloff,* 510 S.W.2d 913 (Tex.1974); *Beckendorff v. Harris-Galveston Coastal Sub. Dist.,* 558 S.W.2d 75 (Tex.Civ.App.—Houston [14th Dist.] 1977), *aff'd,* 563 S.W.2d 239 (Tex. 1978). This is particularly true where, as here, the administrative action being attacked is one taken while the agency is in its infancy and is operating without the benefit of judicial construction of its enabling statute. *Power Reactor Devel. Co. v. International U., etc.,* 367 U.S. 396, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); *Beckendorff v. Harris-Galveston Coastal Sub. Dist.,* 558 S.W.2d at 82. The trial court erred in its interpretation of the Sign Code. Appellants' twentieth point of error is sustained.

In their twenty-first through twenty-sixth points of error appellants contend the trial court erred in concluding that appellees were entitled to conform their billboards with cutouts attached under Sign Code § 4609(f) in accordance with the amortization provisions of H.B. 1330, rather than as of June 1, 1986, as required by the city.

Specifically, the portion of the court's judgment concerning this complaint declared:

that Plaintiffs are entitled to bring all of their signs which fail to comply with the size (cut out) provision of the Houston Sign Code [§ 4609(f)] into conformance with that Code section in accordance with the provisions of Article 1, Sec. 6 of H.B. 1330, rather than as of June 1, 1986 as required by the City of Houston.

In its findings of fact the trial court concluded:

45. A lawfully-erected sign which exceeds 672 square feet and violates Sec. 4609(f) of the Code because of the inclusion of a cutout extending beyond the rectangular 14' and 48' borders is a *nonconforming sign.*

■ Again, this is a conclusion of law, which, in our opinion, is erroneous. Sign Code § 4609(f), since its enactment in 1980, has provided that an off-premise sign could not have a face area exceeding 672 square feet, "including cutouts," but excluding uprights. A cutout is not, within itself, illegal. However, when the size of the cutouts cause the overall size of the billboard to exceed 672 square feet, the cutouts make the sign illegal, not nonconforming. In explaining the distinction, the sign administrator stated that a permit is *only* issued for a 672 square foot sign and when the sign owner then adds to the face of that sign a cutout, this causes the sign to violate the Sign Code. We see no distinction between this situation and the situation where a sign is erected without a permit at all. Both would be illegal, because H.B. 1330, art. 1, § 8(a) states that any sign erected in violation of the local ordinance is not entitled to the amortization provisions of H.B. 1330. The court was therefore in error in classifying as "nonconforming" those signs where cutouts cause the sign face to exceed 672 square feet. Further, the trial court's conclusion that appellants are entitled to bring such signs into conformance with the code under the amortization provisions of article 1, section 6 of H.B. 1330 is also erroneous. Appellants' twenty-sixth point of error is sustained.

In their twenty-seventh through twenty-ninth points of error appellants contend the trial court erred in declaring city ordinance 85-799 void.

The complained of portion of the judgment provided that the court:

ORDERS, ADJUDGES AND DECLARES that Ordinance 85-799 adopted by the Houston City Council on May 29, 1985 and purporting to extend the Houston Sign Code into Houston's extraterritorial jurisdiction, as defined by the Municipal Annexation Act [codified at Tex. Rev.Civ.Stat.Ann. art. 970a] is void ab initio because the Houston City Council lacked the authority to adopt such an ordinance until May 31, 1985, the effective date of Article 3 of H.B. 1330 [codified at Tex.Rev.Civ.Stat.Ann. art. 1015o].

In its findings of fact the trial court found:

49. The Houston City Council adopted Ordinance No. 85-799 on May 28, 1985.

50. The Texas Legislature intended through Article 3 of H.B. 1330, to give municipalities the authority to regulate signs in their ETJs.

51. Article 3 of H.B. 1330 did not become effective until May 31, 1985.

Appellants timely requested additional findings of fact as to each portion of the declaratory judgment. Here, appellants requested:

The facts and applicable law as to which of the following took place first: (1) the execution by the Governor of Texas of H.B. 1330 or (2) the execution by the Mayor of the City of Houston Ordinance 85-799, extending its Sign Ordinance into its extraterritorial jurisdiction.

The court responded:

The Court rejects any requests for additional findings and conclusions regarding the timing of Mayor Whitmire's signature as irrelevant and immaterial because the adoption of the ordinance by City Council constitutes the determinative factor.

■ There was no dispute in the evidence that the mayor signed the ordinance in question an hour and ten minutes after the governor signed H.B. 1330 into law. Appellants contend, therefore, that the

court erred in concluding the ordinance was void ab initio. We agree.

Article VI, section 6 of the Houston City Charter provides:

> Every ordinance, resolution or motion of the city council shall, before it takes effect, be presented to the mayor for his approval and signature. If the mayor shall fail to sign any ordinance, resolution or motion within five days after adoption, it shall nevertheless be in full force and effect as if he had signed the same. The mayor shall at all times preside over all meetings of the city council and shall on all occasions be privileged to vote. He shall not have the right and privilege of veto.

It is clear that the ordinance did not become effective until either (1) the mayor signed it, or (2) in the absence of approval or signature of the mayor five days had lapsed since its adoption. In fact, appellees concede in their brief "that the ordinance would not have been enforceable until May 31, 1985." Appellees contend, however, the real issue is "whether the Houston City Council had the requisite authority to consider and pass" the ordinance on May 29, 1985.

When faced with the same question of whether the city council acted prematurely in passing an ordinance the El Paso court stated:

> This Act of the 58th Legislature became effective on August 23, 1963, which is 90 days after adjournment. The trial court found that Ordinance 2976, although adopted at the August 22, 1963, Council meeting, did not become operative until it was published on August 26, 1963. Sec. 181 of the El Paso City Charter requires all penal ordinances to be published in the designated official newspaper. This ordinance, being a penal ordinance, did not become operative until it was published.

*B & B Vending Co. v. City of El Paso,* 408 S.W.2d 545 (Tex.Civ.App.—El Paso 1966, writ ref'd n.r.e.); *see also Trio Independent School District v. Sabinal Independent School District,* 192 S.W.2d 899 (Tex. Civ.App.—Waco 1946, no writ) (where the

court stated "an act does not speak just from the date it was passed by the House or by the Senate, *but it speaks from the date it takes effect,* that is, *on the date it becomes a law."*). We therefore conclude that the court erred in declaring the ordinance void. Appellants' twenty-ninth point of error is sustained.

In their points of error thirty through thirty-three appellants complain of the award of attorneys' fees made by the trial court. The trial court awarded $146,818.22 as "reasonable and necessary attorneys fees pursuant to Sec. 37.009 of the Texas Civil Practice and Remedies Code." The court further awarded $25,000 upon the filing of an appeal to the court of appeals, $15,000 upon filing an application for writ of error to the supreme court, and $10,000 if the court grants the application.

Tex.Civ.Prac. & Rem.Code Ann. § 37.009 (Vernon 1986) provides that "[i]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." The trial court's decision will not be reversed absent a showing of abuse of discretion. *Oake v. Collin County,* 692 S.W.2d 454 (Tex.1985).

Where a trial court denies declaratory relief, or, as here, a trial court improperly renders a declaratory judgment we find it is an abuse of discretion to award attorneys' fees to a party that is not entitled to any relief. *See La Cour Du Roi, Inc. v. Montgomery County,* 698 S.W.2d 178 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.). Appellants' thirty-third point of error is sustained.

In points of error thirty-four and thirty-five appellants complain the court erred in failing to award them their requested fees. As we stated above, the award of attorneys' fees lies within the discretion of the trial court. No abuse of discretion was shown. Therefore, these points of error are overruled.

The judgment entered by the trial court also names the State of Texas as a defendant. The state has filed a brief in this court requesting the reversal of that por-

tion of the judgment awarding attorneys' fees against the state, contending the trial court was without jurisdiction to enter a money judgment against the state since the state had not consented to be sued. Since we are ordering the case reversed, further discussion of this point is unnecessary.

The judgment of the trial court is reversed and judgment is rendered that appellees take nothing.