Billy Ray MARTINEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–84–067 CR.

Court of Appeals of Texas,
Beaumont.

Opinion on Motion for Rehearing
May 31, 1988.

George H. Tyson, Jr., Colin B. Amann, Ramsey & Tyson, Houston, for appellant.

Peter Speers, III, Dist. Atty., Montgomery County, Conroe, for appellee.

## OPINION ON MOTION FOR REHEARING

DIES, Chief Justice.

Appellant was indicted on two forgery counts, two counts of misapplication of fiduciary property, and one felony theft count. The State agreed to dismiss the two forgery counts after one of the State's attorneys tampered with and altered the original grand jury indictment. Appellant was convicted of both counts of misapplication and the felony theft count. On appeal, this court held the prosecutor's misconduct rendered the entire trial void ab initio. *Martinez v. State,* 700 S.W.2d 27, 28 (Tex. App.—Beaumont 1985). The Court of Criminal Appeals, however, vacated that judgment and remanded to this court for further proceedings on fourteen points of error which had not yet been considered. *Martinez v. State,* 742 S.W.2d 687 (Tex. Crim.App.1987). On remand, we summarily overruled Appellant's remaining fourteen points, but now reconsider that disposition on Appellant's motion for rehearing.

Under points of error seven, eight, and nine, Appellant attacks the sufficiency of the evidence to support his conviction under the first count of misapplication. There are five elements to the offense of misapplication of fiduciary property: a person must (1) intentionally, knowingly, *or* recklessly (2) "misapply" (3) property he holds as a "fiduciary" (4) in a manner that involves substantial risk of loss (5) to the "owner" of the property *or* to a person for whose benefit the property is held. *TEX. PENAL CODE ANN. sec. 32.45* (Vernon 1974). The portion of the indictment alleging the first misapplication count reads:

"[Appellant] did then and there intentionally, knowingly and recklessly misapply property of a value of more than $10,000.00, to-wit: the approximate one half acre of land and improvements thereon including a building known as the Gospel Tabernacle in Willis, Montgomery County Texas, which said property the said [Appellant] held as a fiduciary, but not as a commercial bailee, to-wit: as a trustee for Gospel Tabernacle, in a manner that involved substantial risk of loss to the owner of said property, to-wit: the membership of Gospel Tabernacle, by then and there deeding said property to himself and buying said property for himself contrary to the provisions of the Texas Trust Act, Vernon's Ann. Civil Statutes, Art. 7425b–12, a law prescribing the disposition of the property."

In reviewing the sufficiency of the evidence, an appellate court must determine whether any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. *Jackson v. State*, 672 S.W.2d 801, 803 (Tex.Crim. App.1984). A reviewing court will look at all the evidence in the light most favorable to the verdict. *Houston v. State*, 663 S.W. 2d 455, 456 (Tex.Crim.App.1984).

■ In point of error seven, Appellant asserts that the State failed to prove Appellant misapplied property "contrary to the provisions of the Texas Trust Act, Vernon's Ann. Civil Statutes, Art. 7425b–12" since the evidence was insufficient to show the existence of an express trust. Duties imposed by the Texas Trust Act apply only to express trusts. TEX.REV.CIV.STAT. ANN. art. 7425b–2 (Vernon 1960).[1] The real property in question was originally conveyed by Appellant's parents to "Franklin Wells, Curtis Nelson, and Billy Ray Martinez, as Trustees of Gospel Tabernacle." Point of error seven is overruled since we find the existence of a valid charitable trust. TEX.REV.CIV.STAT.ANN. 7425b–7 (Vernon 1960).[2] *Unthank v. Rippstein*, 386 S.W.2d 134, 135 (Tex.1964). *See also Hackfeld v. Ryburn*, 606 S.W.2d 340, 342 (Tex.Civ.App.—Tyler 1980, writ dism'd), and *Rice v. Morris*, 541 S.W.2d 627 (Tex.Civ.App.—Corpus Christi 1976, writ dism'd by agr.).

■ In point of error eight, however, Appellant urges that the State failed to prove substantial risk of loss "to the owner of said property, to-wit: the membership of Gospel Tabernacle." Appellant's argument is based in part on the fact that Gospel Tabernacle had ceased to exist at the time any misapplication occurred. The evidence shows that Appellant's family first began conducting their own church services as Gospel Tabernacle in 1972. For the next few years, services were held at the Gospel Tabernacle four times a week. In 1978, however, due to a lack of interest and a dwindling congregation, the church mem-

bers decided to cease conducting weekly worship services and liquidate church assets. In fact, considering that, at the time of misapplication, the church had ceased all of its regular functions of work and worship for approximately three years, a receiver could have been appointed to liquidate church assets. *See* TEX.REV.CIV. STAT. art. 2293a (Vernon 1971).[3] As such, the Gospel Tabernacle was not in existence as a matter of law. Liquidation of the assets of any entity cannot occur unless that entity is no longer in existence. Thus, the asset in question was not subject to disposition by a lawfully appointed receiver and was the subject of an express trust which had failed for want of beneficiary or trust purpose. The trust purpose could not have been reformed under the doctrine of cy pres since there was clearly no *general* charitable intent, but rather only a *specific* charitable intent expressed within the trust document. *Foshee v. Republic Nat'l Bank of Dallas*, 617 S.W.2d 675 (Tex.1981). When an express trust fails, a resulting trust arises in favor of the settlor. *Id.* Thus, the State failed to prove that the owner was "the membership of Gospel Tabernacle." Appellant's additional argument, however, that "owner" as it is defined under *TEX.PENAL CODE ANN. '1.07(24)* (Vernon 1974) cannot include a trust beneficiary as against his trustee, must be rejected as contrary to the broad interpretation of this section as one designed by the legislature "to protect all ownership interests in property from criminal behavior." *See Freeman v. State*, 707 S.W.2d 597 (Tex. Crim.App.1986). Also, by analogy, theft by one co-owner of property is prohibited even though the non-actor also holds title to the allegedly stolen property and may not have an exclusive right to possession. *TEX.PE-NAL CODE ANN. arts. 31.03 & 31.10* comments (Vernon 1974). Appellant's eighth point of error is sustained.

**1.** *Repealed by* Acts 1983, 68th Leg., p. 3729, ch. 576, sec. 6, eff. Jan. 1, 1984, *now TEX.PROP. CODE ANN. sec. 111.001, et seq.* (Vernon 1984 & Vernon Supp.1988).

**2.** *Repealed by* Acts 1983, 68th Leg., p. 3729, ch. 576, sec. 6, eff. Jan. 1, 1984, *now TEX.PROP. CODE ANN. sec. 112.001* (Vernon 1984).

**3.** *Repealed by* Acts 1985, 69th Leg., ch. 959, sec. 9(1), eff. Sept. 1, 1985, *now TEX.CIV.PRAC. & REM.CODE ANN. sec. 126.002* (Vernon Supp. 1988).

■ Point of error nine, complaining that the State failed to prove allegations in the indictment that he held property as a trustee "for Gospel Tabernacle" must likewise be sustained since the membership of Gospel Tabernacle was not the equitable title holder at the time Appellant misapplied the property. This unproven allegation was descriptive of the necessary allegation that Appellant held the property as a fiduciary, and therefore, there is a fatal variance between the allegations and the proof. *See Romay v. State,* 442 S.W.2d 399 (Tex.Crim.App.1969). Appellant's conviction under the first count of misapplication of fiduciary property is reversed, and we order the trial court to enter an order of acquittal therein.

In points of error ten, eleven, twelve, and thirteen, Appellant challenges the sufficiency of the evidence to sustain his conviction under the second count of misapplication of fiduciary property. The portion of the indictment alleging the second count of misapplication reads:

"[Appellant] did then and there intentionally, knowingly and recklessly misapply property of a value of more than $10,-000.00, to-wit: more than $99,000.00 dollars in United States currency, which property he held as a fiduciary, but not has [sic] a commercial bailee, to-wit: as a trustee for the Gospel Tabernacle in Willis, Texas, by transferring $30,000.00 to Paul Davis, $9,000.00 to Holly Moore, and by converting, spending and concealing the remainder of said funds, contrary to a law prescribing the disposition of said property, and he did then and there by such action create a substantial risk of loss to the person for whose benefit the property was held, to-wit: the membership of Gospel Tabernacle."

Appellant asserts in point of error twelve that the evidence was insufficient to prove its allegations that the property was being held "for the benefit of Gospel Tabernacle." We agree for the reasons discussed under the disposition of point of error nine. Appellant's point of error twelve is sustained. We reverse Appellant's conviction

of the second count of misapplication of fiduciary property and instruct the trial court to enter an order of acquittal of this charge.

Points of error eleven and thirteen challenging the sufficiency of the evidence under the second count of misapplication to establish (1) an express trust and (2) that Appellant still possessed fiduciary duties as a trustee are overruled for reasons discussed in disposing of points of error seven and nine, respectively. Point of error ten asserting the State failed to establish that Appellant dealt with property "contrary to a law prescribing the disposition of the property" is overruled since the State proved a violation of *TEX.PENAL CODE ANN. sec. 31.03* (Vernon 1974 & Vernon Supp.1988). Point of error ten is overruled.

■ In points of error five and six, Appellant asserts that the offenses of misapplication of fiduciary property and theft were improperly joined in the indictment and that the trial court erred in not granting Appellant's motion to compel the State to elect. Appellant is correct in asserting that the theft count was improperly joined in one indictment with the two counts of misapplication of fiduciary property. The general rule states that "regardless of the number of allegations in a charging instrument, the State may obtain only one conviction and one sentence thereon." *Fortune v. State,* 745 S.W.2d 364 (Tex.Crim.App. 1988), citing *Drake v. State,* 686 S.W.2d 935 (Tex.Crim.App.1985) (opinion on appellant's petition for discretionary review). A statutory exception to that rule exists for "two or more offenses ... aris[ing] out of the same criminal episode, as defined in Chapter 3 of the Penal Code." *TEX.CODE CRIM.PROC.ANN. art. 21.24* (Vernon Pamph 1988); *TEX.PENAL CODE ANN. sec. 3.02* (Vernon 1974). A "criminal episode" is defined as "the repeated commission of any one offense defined in Title 7 of this code (Offenses Against Property)." *TEX.PENAL CODE ANN. sec. 3.01* (Vernon 1974), *amended by* Acts 1987, 70th

Leg., ch. 387, sec. 1, eff. Sept. 1, 1987.[4]

■ The State correctly points out that Appellant failed to properly raise misjoinder before the trial court. Before the jury was instructed, Appellant made the following motion:

"[DEFENSE COUNSEL]: Judge, relative to compelling an election, at this time after both sides have rested and before the jury is instructed on the law, the Defendant moves that the Court compel the State to elect which count will be submitted to the jury.

"THE COURT: Denied."

The objection fails to specify whether the request was to compel election between the two misapplication counts, which were properly joined, or between the misapplication counts and the theft count. Appellant's point of error six is overruled.

■ Objection at trial, however, is not necessary to preserve a claim of misjoinder. The misjoinder of the theft count with the misapplication counts was fundamental error since the State had no authority upon which to base multiple convictions from a single indictment. *Fortune,* 745 S.W.2d 364 (Tex.Crim.App.1988). Appellant's point of error five is sustained. The record reveals that the jury first found Appellant guilty of the two counts of misapplication and then found him guilty of theft. The judgments of the trial court were also entered in this order. When the trial court erroneously enters multiple judgments of conviction of more than one offense, the appellate court may cure this error by choosing one of the convictions to affirm and dismissing the rest. It is usually proper to affirm the conviction for the offense for which the defendant was first convicted. *See Holcomb v. State,* 745 S.W.2d 903 (Tex.Crim.App.1988). However, since we have reversed Appellant's convictions for misapplication of fiduciary property for insufficiency of the evidence, the judgment of conviction of the offense of theft is affirmed. *See Garcia v. State,* 574 S.W.2d 133 (Tex.Crim.App.1978).

■ In point of error fourteen, Appellant maintains that the trial court erred in not allowing Appellant's experts to testify on the law of trusts. Such evidence was properly excluded since it is the trial court's province to instruct the jury on the law relevant to the case. *TEX.CODE CRIM. PROC.ANN. art. 36.13* (Vernon 1981). Point of error fourteen is without merit.

■ Appellant claims under points fifteen, sixteen, seventeen, and eighteen that the trial court erred in failing to charge the jury on certain issues. Point fifteen must be overruled since the trial court properly refused Appellant's requested charge that an act of self-dealing is not otherwise exceptional by the cestui que trust if it does not challenge the self-dealing transaction since the rule of *Harvey v. Casebeer,* 531 S.W.2d 206 (Tex.Civ.App.—Tyler 1975, no writ), is not applicable in the criminal context. Point of error sixteen asserts the trial court should have instructed the jury on article 7425b–18 of the Texas Trust Act. The mere fact that a majority of the trustees engaged in a transaction cannot validate an otherwise illegal action of the trustees. Point of error sixteen is overruled. Point of error seventeen is likewise without merit since the trial court properly denied Appellant's request to charge the jury that an invalid trust instrument absolves the named trustee of *any* fiduciary duty. Point of error eighteen asserts the trial court should have charged the jury that when the purpose of a trust fails there is a resulting trust in favor of the original grantors and any fiduciary duty of a trustee is owed toward the original grantors. Point of error eighteen should be sustained outside our disposition of points of error nine, eight, and twelve since a defensive issue of termination of the trust purpose or trust beneficiary was raised by the evidence, *Green v. State,* 566 S.W.2d 578, 584 (Tex.Crim.App.1978), and failure to so charge the jury resulted in

4. The pre-amendment act continues in effect for those offenses committed before September 1, 1987. Acts 1987, 70th Leg., ch. 387, sec. 2.

Appellant was convicted for offenses committed in 1981.

some harm to Appellant. *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App.1985).

Affirmed in part; reversed in part.

BROOKSHIRE, Justice, dissenting.

With respect, this dissent is filed. On a previous date, a unanimous Ninth Court of Appeals overruled Martinez' points of review and affirmed the District Court. The Court takes a dramatically opposite position in its opinion on the Motion for Rehearing. It is significant that the Appellant was convicted on two separate counts of misapplication of fiduciary property and one separate count of felony theft. The Court of Criminal Appeals remanded the case to this Court for further proceedings dealing with the fourteen "points of error" which had not been considered by our Ninth Court.

The Court strikes down the convictions of two separate counts of misapplication of fiduciary properties or assets on the theory that the State failed to prove the existence of the owner or owners of the fiduciary property, to-wit: the membership of Gospel Tabernacle. The Court basically held that the Tabernacle had ceased to exist. Respectfully, I disagree. Interestingly, the Court, in its opinion, writes that the members, themselves, decided to liquidate the church's assets. This affirms the existence of members. Hence, the Trustee—Appellant, in law, had an obligation and duty to account to the members *and beneficiaries* for his actions. This, Appellant failed to do. The Court correctly acknowledges that a Receiver could have been appointed to liquidate the Tabernacle's assets, citing *TEX.REV.CIV.STAT.ANN. art. 2293a* (Vernon 1971). Repealed by Acts 1985, 69th Leg., ch. 959, sec. 9(1), eff. Sept. 1, 1985, *now TEX.CIV.PRAC. & REM.CODE ANN. sec. 126.001, et seq.* (Vernon 1986 and Vernon Supp.1988). I opine that a Receiver should have been appointed under the supervision of a court of competent jurisdiction.

Furthermore, the Court holds that the trust properties could not have been reformed and could not have been put to a similar use under the doctrine of cy pres, since only a specific, charitable intent was expressed. For this ruling, the Court cites only one case, to-wit: *Foshee v. Republic Nat'l Bank of Dallas*, 617 S.W.2d 675 (Tex. 1981). *Foshee, id.*, is easily distinguished, on its facts, from this case. In my opinion, *Foshee, id.*, is not an appropriate authority. There, a perpetual trust was attempted to be set up for the upkeep of a purely private burial plot. A testatrix, in her Will, bequeathed $40,000 to a mausoleum special gift fund for the perpetual keeping, beautifying and purchasing of flowers for a private burial plot of the decedent—testatrix, her mother and her brother only. This bequest was obviously not charitable or public in nature and it violated the rule against perpetuities. The bequest was a private, very limited one. *TEX. CONST. art. I, sec. 26* (Vernon 1984). There, the Supreme Court declared it was settled law of this State that the rule against perpetuities renders invalid any will or a portion of a will that attempts to create an estate or a future interest which may not become vested within a life or lives in being at the time of the testator's death plus 21 years thereafter and when it is necessary plus the further period of gestation. *Kettler v. Atkinson*, 383 S.W.2d 557, 560 (Tex.1964). It is likewise settled law that the rule against perpetuities applies to private trusts and therefore a private perpetual trust of indefinite duration is void. *Moore v. Sellers*, 201 S.W.2d 248 (Tex.Civ.App.—San Antonio 1947, writ ref'd); *Carr v. Jones*, 403 S.W. 2d 181 (Tex.Civ.App.—Houston [1st Dist.] 1966, writ ref'd n.r.e.). *Foshee v. Republic Nat'l Bank of Dallas*, 617 S.W.2d 675 (Tex. 1981), cannot possibly, in my opinion, defeat the application of cy pres under this record.

Additionally, concerning the first conviction, based on the first count on the misapplication of fiduciary property, the Court sustains Appellant's Point of Error No. 9, holding that the State failed to prove that the Appellant held the Tabernacle properties as a Trustee "for Gospel Tabernacle." Under Point of Error No. 9, the Court likewise holds that the membership of the Gospel Tabernacle was not the equitable title owner or holder when the misapplica-

tions occurred. In my opinion, I respectfully maintain that these rulings and holdings by the Court are dramatically wrong and conflict with the most basic Hornbook rules governing the law of trusts.

Sustaining Appellant's Point of Error No. 12, the Court strikes down the conviction under the second count of misapplication of fiduciary property. The Court writes that the fiduciary properties were not being held "for the benefit of Gospel Tabernacle." Again, respectfully, I disagree. The Court then orders an acquittal of each of the two convictions of misapplication of fiduciary property.

The Court's decision, then, is basically undergirded, inter alia, on the following holdings, to-wit: that the Gospel Tabernacle ceased to exist, that the Tabernacle had no members *or beneficiaries,* that the express trust failed for want of a trust purpose, that the salutary and equitable *doctrine of cy pres could not apply,* that the membership of Gospel Tabernacle was not the equitable, beneficial titleholder or owner of the properties, and that the evidence was insufficient to prove that the properties were being held "for the benefit of Gospel Tabernacle."

The reasons and rationale for my dissent are set out herein and below.

Unexpectedly and surprisingly, the Court explodes Appellant's argument that an owner, as same is defined in *TEX.PENAL CODE ANN. Sec. 1.07(a)(24)* (Vernon 1974), cannot include a trust beneficiary or cestui que trust as against his trustee. *Sec. 1.07(a)(24)* defines "owner", in part, as a person having a greater right to possession of the property than the actor. The Court cites, with approval, *Freeman v. State,* 707 S.W.2d 597 (Tex.Crim.App.1986) holding that the issue of ownership goes to the scope or nature of the property interest sought to be protected by the law and this protection is intended to safeguard and protect all ownership interest in property from criminal behavior.

The Appellant argues in points 5 and 6, that the offenses of misapplication of fiduciary property—being two counts—and the felony theft count are improperly joined.

*TEX.CODE CRIM.PROC.ANN. Art. 21.24* (Vernon Supp.1988), provides as follows:

"Art. 21.24. Joinder of certain offenses

"(a) Two or more offenses may be joined in a single indictment, information, or complaint, with each offense stated in a separate count, if the offenses arise out of the same criminal episode, as defined in Chapter 3 of the Penal Code.

"(b) A count may contain as many separate paragraphs charging the same offense as necessary, but no paragraph may charge more than one offense.

"(c) A count is sufficient if any one of its paragraphs is sufficient. An indictment, information, or complaint is sufficient if any one of its counts is sufficient."

It is evident that two or more offenses may be joined in a single indictment if the offenses arise out of the same criminal episode, as defined in Chapter 3 of the Penal Code. Significantly, a count is sufficient if any one of its paragraphs is sufficient and an indictment is sufficient if any one of its counts is sufficient. This is not a stumbling block, because both "Fraud" and "Misapplication of Fiduciary Property" are defined offenses in Title 7 of the Code. *TEX.PENAL CODE ANN. Sec. 3.02* (Vernon 1974) provides:

"(a) A defendant may be prosecuted in a single criminal action for all offenses arising out of the same criminal episode...."

*TEX.CODE CRIM.PROC.ANN. art. 27.-05* (Vernon Supp.1988) recognizes and acknowledges as an existing, real, valid proposition that the same repeated or different offenses can arise out of the same criminal episode and that a prosecution for these several offenses can take place.

*Title 7,* above referred to, includes *TEX. PENAL CODE ANN. Ch. 32* (Vernon 1974, Vernon Supp.1988), which is entitled "Fraud". Within *Title 7, Chapter 32,* there is a *Sec. 32.45,* entitled "Misapplication of Fiduciary Property or Property of Financial Institution". *Sec. 32.45* defines a "fiduciary" and "misapply" and sets out how a person commits an offense under

*Sec. 32.45.* Simply stated, the offense occurs if a person intelligently, knowingly or recklessly, misapplies property that he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property *or* to a person for whose benefit the property is held. If the value of the property involved is $10,000 or more, a felony of the second degree is enunciated. It should be noted that it is not a necessary element of the offense of misapplication of fiduciary property that the actor, or anyone else, received a benefit from the misapplication. However, if the actor does receive a benefit, a violation of *Chapter 31*, (dealing with theft) occurs. *TEX.PENAL CODE ANN. ch. 31* (Vernon 1974).

It is clear that there was no misjoinder of the two counts in the indictment concerning the misapplication of fiduciary funds. Appellant's motion urging misjoinder came after both sides rested. Said motion came just before the jury was charged. The motion was ambiguous. Defense counsel did not make the trial court aware of what alleged misjoinder was involved and on what basis the trial court should compel the State to elect. The Court concedes that the motion totally fails to specify whether the motion was to compel an election between the two misapplication counts or between the misapplication counts and the theft count. Hence, the motion lacked specificity; it was ineffectual. Without any question there was no misjoinder between the two misapplications of fiduciary funds. *Fortune v. State*, 745 S.W.2d 364 (Tex.Crim.App.1988) cited by the court dealt with a different situation. In *Fortune*, the offenses were not both offenses against property.

The Court sets out, in its opinion, dealing with points of error 7, 8 and 9 which attempt to challenge the sufficiency of the evidence to support Appellant's first conviction under the first count of misapplication of fiduciary property, its reasons for reversing the conviction therein. There can be no real argument or contention, under this record, that the Appellant was a person who, at least recklessly, misapplied property that he held as a fiduciary. It is also glaringly clear that the misapplication

was performed in such a manner that it involved not only a substantial risk of loss but an actual substantial loss. However, the Court holds that the State failed to show who was the owner or beneficiary of the property, or failed to show a person for whose benefit the property was held. I respectfully disagree.

In reviewing the sufficiency of the evidence, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. State*, 672 S.W.2d 801 (Tex.Crim.App. 1984). A reviewing court must review and analyze the evidence in the light most favorable to the verdict. *Houston v. State*, 663 S.W.2d 455 (Tex.Crim.App.1984).

The Court takes the position that the State failed to prove the allegation in the indictment that Martinez held the property, as Trustee for "Gospel Tabernacle" and the membership thereof. The Court holds that the Gospel Tabernacle had ceased to exist at the time of the misapplication.

The Court overturns the conviction on the misapplication of fiduciary property on the basis that the trust had failed for want of a beneficiary or for a trust purpose. With respect, I disagree. The majority agrees that the State established the existence of an express trust. I would hold that the State amply showed, by sufficient evidence of probative force, that the trust had not failed for want of a beneficiary of beneficiaries or for a trust purpose. The record shows that the Appellant deeded the property in question to himself, which conveyance was clearly contrary to the provisions of the Texas Trust Act, formerly *TEX.REV.CIV.STAT.ANN. Art. 7425b–7* (Vernon 1960) repealed by Acts 1983, 68th Leg., p. 3729, ch. 576, sec. 6, eff. Jan. 1, 1984, *now TEX.PROP.CODE ANN. sec. 112.001, et seq.* (Vernon 1984), setting out how an express trust may be created.

The record proves that a deed was made and delivered to Franklin Wells, Curtis Nelson and Billy Ray Martinez, Trustees for Gospel Tabernacle, conveying a tract or parcel of land, with improvements thereon,

being ½ acre in the F.K. Henderson Survey, Abstract No. 248, Montgomery County. This deed is dated December 1, 1973, and acknowledged on the same date. It was recorded December 3, 1973, at 10:00 o'clock A.M. There is an inference or misunderstanding to the effect that Appellant was merely dealing with his own family property. It is significant to note that, in 1973, the members of the Tabernacle decided to build a new church building. They obtained loan papers and the three Trustees signed a note to borrow several thousand dollars to construct a new metal building. Also extensive repairs were made to the older structure. Among the repairs were large window units, referring to air conditioning units. The original church building was in bad need of repair. The old structure had no air conditioning or central heat. The old building was on blocks for a foundation.

The church members and Trustees apparently decided to pour a slab and build a metallic building which contained restrooms in the front, but there was not enough money to complete the plans so it was necessary to borrow money from the bank. The three Trustees signed the loan papers, including a promissory note in the sum of $6,500 or $6,600. The record reflects that the members of the church helped build the forms, haul the sand and spread it. They assisted in plumbing the church building. Some persons came to help from Houston who were not regular members of the Tabernacle but had a close relationship to it. There were numerous members of the Tabernacle, and a number of members of the Gospel Assembly in Houston who worked and provided labor and materials and made other donations to the church building. Gospel Assembly was similar to Gospel Tabernacle in many meaningful ways. The money from the bank loan went, primarily, for the metal building. Hence, it is abundantly clear that the church the Appellant deeded, as a Trustee, to himself was not the same structure that he initially received as one of the three trustees. It was greatly improved and was much more valuable.

Most of the lumber was donated from the Suburban Home Lumber Company in Houston. This donation of lumber was arranged by Curtis Nelson. Curtis Nelson, who was in the sheetrock and related businesses in Houston, had his employees help him in taping, floating and blowing the texture on the sheetrock. The ceiling, which was a suspended ceiling, was hung by members from the Houston Gospel Assembly. Nelson personally bought the air-conditioning. The inside units were new. A central air system was installed. Two heating units and two cooling units were installed. They were located inside, with the coils and the duct work inside. The condensing units were on the outside.

Later the attendance at the Tabernacle meetings diminished. There was a discussion between the Trustees, Nelson, Wells and the Appellant, concerning this matter. The Trustees, including the Appellant, decided not to profit, personally, from any sale of the church properties but to put the money into the Lord's work. The record shows that the religious beliefs, practices and services that were held at the Gospel Tabernacle in Willis were similar to those that were held at the Gospel Assembly in Houston and the Gospel Tabernacle at Cut and Shoot. At times, some of the congregation from the Gospel Tabernacle went to, and actually attended and participated in the Gospel Assembly services in Houston. There is evidence that the congregants from Willis, with notable regularity, attended Saturday and other services at the Gospel Assembly in Houston.

The three Trustees consulted about selling the building and the properties. They agreed the building and properties were not theirs personally. Basically they said the building and properties were the Lord's and they should be the work of the Lord's. Further, there was serious consideration given to the idea of the money going to some other churches. Curtis Nelson wanted to put the money into the Gospel Assembly in Houston. There was also a similar Assembly or Tabernacle at nearby Cut and Shoot, Texas. Nelson wanted part of the money to go there because some of the members of the Willis groups had gone

into the Cut and Shoot Tabernacle, which was very similar to the Gospel Tabernacle at Willis. The congregation at Cut and Shoot was popularly known as the Gospel Chapel and the Gospel Chapel at Cut and Shoot had an affiliation and connection with the Gospel Assembly in Houston. The equitable doctrine of cy pres and its proper application naturally came to mind.

In sustaining Appellant's point of error No. 9, the Court takes the position that the trust, which was an express trust, had failed for want of a beneficiary or for a trust purpose—not so.

The Court fails to take the position that the equitable doctrine of cy pres applies. Under this record, I strenuously disagree. Cy pres does fit if needed. There was an express trust to Franklin Wells, Curtis Nelson and Billy Ray Martinez, which is shown by State's Exhibit # 2—the deed. The consideration was all in cash, the sufficiency of which was fully acknowledged and confessed. In fact, the express trust was set out in three different places in the Warranty Deed; first, in the clause setting out the consideration as having been paid by Trustees and, second, in the "grant, sell and convey" clause. The deed was made to the three as Trustees. The clause, "to have and to hold", was to the three, as Trustees. Even the general warranty clause read to the three as Trustees. There was absolutely no reversion clause or clause in favor of remaindermen. Thus no obstacle exists to cy pres.

The record proves that there was a Gospel Tabernacle account and that Billy Ray Martinez deposited the money received from the county into that account and wrote checks out of that account. These facts are proof that the charitable religious trust did not fail. I would stress that Billy Ray Martinez, when he swore to and notarized the deed before Carol Davis, the deed dated September 3, 1981, he signed as "Billy Ray Martinez, Trustee". This deed, of September 3, 1981 bears the admittedly and *conclusively proven forged signature of Curtis Nelson.* It conveyed the church property from Billy Ray Martinez, Trustee for Gospel Tabernacle, into Billy Ray Mar-

tinez, individually, wherein he violated his trust. Thus, it is conclusively shown that the Appellant admits in writing in an important legal document that he held the property in his capacity as Trustee and that his actions and his written recitals show the existence of the Gospel Tabernacle. *See TEX.REV.CIV.STAT.ANN. Art. 7425b-7* (Vernon 1960).

Charitable and religious trusts are looked upon, with favor, by the law. Trusts and gifts for religious purposes are also for charitable purposes. Charitable purposes are deemed in law to include religious church purposes. Charitable and religious trusts can be, and are, created by deeds as well as wills. No technical, special words are required to establish such a charitable or religious use or trust. Texas courts also recognize the favored status of charitable religious trusts. *See Boyd v. Frost National Bank,* 145 Tex. 206, 196 S.W.2d 497 (1946). Charitable purposes definitely include an advancement of a religious movement. *Carr v. Jones,* 403 S.W. 2d 181 (Tex.Cir.App.1966).

Appellant dealt with and signed and executed written instruments reaffirming the Gospel Tabernacle had not expired and the trust purpose had not failed. He deposited the nearly $100,000 in the Gospel Tabernacle's bank account after receiving the funds from Montgomery County. There is ample evidence of strong probative force to clearly demonstrate that the trust did not fail for the lack of a trust purpose, nor did it fail for lack of a cestui que trust.

It is hornbook law that the beneficiaries of a trust or the cestui que trust, have the entire equitable title. The "Trustees" merely hold the bare legal title and not the beneficial title. This has been the rule in equity since the memory of man runneth not to the contrary and, the trustees, hold the property in trust in a fiduciary relationship to the real owners of the beneficial interest.

Under this record, the Gospel Tabernacle did not cease to exist. The members were active. They met at times at neighboring places. There were other churches with very similar names and very similar prac-

tices and beliefs, which included some of the penitents of the Gospel Tabernacle. Some of these penitents were frequently active in the Gospel Chapel at Cut and Shoot, Texas, and others were active in the Gospel Assembly located in Houston. It is settled law that one of the characteristics of a religious trust or charitable trust is that the trust is for the benefit of an indefinite, changing number of persons. The individual identities of the members change from time to time. It is likewise settled law that the trustor/settlor may, in the actual creation of the trust, prescribe for a disposition of the property in the event of the failure of the trust but the relevant deed, here, contains no such language. Since there is no reversionary clause, or any language to that effect, the property then should not revert to the trustors. *See Scott v. Sterrett,* 234 S.W.2d 917 (Tex.Civ. App.—Dallas 1950, writ ref'd n.r.e.); *see also Worcester County Trust Co. v. Grand Knight of Knights of Columbus,* 325 Mass. 748, 92 N.E.2d 579 (1950).

The evidence before us is an ideal fact situation for the application of the cy pres doctrine. It is of important public interest that the dissolution of churches in Texas receive careful, concerned treatment under the Texas law.

Since other Tabernacles existed nearby in which Willis members also attended, the trust cannot fail, since it can be used for the purposes intended, or clearly cy pres for a similar purpose. Texas courts will attribute such intentions and purposes to the trustors. 19 TEX.L.REV. 102 (1941).

*TEX.REV.CIV.STAT.ANN. Art. 2293(1)* (Vernon 1971), provides that the district court may appoint a receiver when an organization, which formerly worshiped in a given community, *has ceased to function for a long period of time.* No receiver was appointed; Appellant did not apply for a receiver.

At one time, the church had approximately 35 to 40 active penitents or congregants. The record shows that, in September of 1981, the Appellant directed his then 16-year-old son, Billy Ray Martinez, Jr., amicably known as "Scooter", to sign or forge Curtis Nelson's name to the deed which conveyed the nominal title into the Appellant. Curtis Nelson, who had donated time, money, materials and workmen, as well as his own personal services, both as a clergyman, pastor, minister, and member, as well as air-conditioning mechanic, never authorized the use of his signature. The Appellant sold the ½ acre lot and building to Montgomery County for use as a precinct office for $100,000. The transaction was closed on or about November 17, 1981, and the Appellant received a check for $99,037.44. The record shows that on the next day, if not the same date, a deposit and deposit ticket for the same amount of $99,037.44 was made into the account of the Gospel Tabernacle. Certainly, Billy Ray Martinez dealt with the Gospel Tabernacle as a viable, religious and charitable trust. He actually put the $99,037.44 money in the name and account of the Gospel Tabernacle. However, his expenditures were not for the benefit of the church, the church members or any church purpose, or trust purpose. Although Martinez received $100,000, there were two appraisers that testified that the value of the properties was only $65,000. The money, among other things, was partially spent for a restaurant, a liquor store and for other matters and accounts. Later, the Appellant purchased the Willis Bank Building with the proceeds from the sale of the church.

On November 18, 1981, the Appellant wrote two checks to Holly Moore that totaled $9,000. Holly Moore was identified as Commissioner Bo Calfee's bookkeeper and friend. Appellant did not testify, but his statements before the grand jury were placed in evidence.

Curtis Nelson pastored the church and acted as its main minister for approximately five years. He held services several times per week. He and his family gave offerings to the church. Nelson was compensated, apparently for his travel expenses. Ministers from the Gospel Assembly of Houston came to pastor and assist in the services at Gospel Tabernacle.

There is evidence that there had been some discussion of the sale of the church

property in 1981. Nelson kept in touch with Martinez on this matter. Along about this time, the building was rented to the Baptist Church in Willis to enable the Baptists to have a temporary outreach service for Spanish-speaking people. Nelson did not know where the rental money from the Baptists went. Nelson testified that there was over $2,000 in the bank prior to the time of the sale and after he left the active, regular pastoring of the Gospel Tabernacle. The new pastor was a Brother Dacus. Later, there was a Methodist minister and a representative of Uniworld that showed a definite interest and wanted to buy the church. Cy pres for a similar purpose was again applicable. Charitable and religious trusts and gifts should be as perpetual as human institutions can be. *Scott v. Sterrett, supra.*

Nelson contacted the Appellant in this regard but the Appellant told Nelson that Montgomery County was interested in buying it. Nelson had quite a few conversations with Martinez concerning the purchase by Montgomery County. Later, Nelson received a telephone call from some of Martinez's relatives to the effect that Martinez had sold the church. The sale had been to the county. Nelson contacted Martinez. Martinez said that the church had not been actually sold, but told Nelson that $100,000 would be the purchase price and that he, Martinez, would get in touch with Nelson when the matter was completed. Nelson made five trips to Willis. Nelson was still interested in the Tabernacle as a member and past preacher. Martinez kept reporting to the effect that the county was going to buy the properties, but that the county would wait until the first of the year so that the county could have the item in an approved budget. On one visit, when Nelson was in Martinez' livingroom, Martinez was reported to have said:

"Boss man, what would you take for your part?"

Nelson said:

"Bill, I don't have a part. It all belongs to the Lord."

Later, Nelson came with his family and met Martinez at "Scooter's Fried Chicken"

in Willis. Martinez still denied having the money in his possession. Later, Nelson called the County Attorney's Office of Montgomery County and learned that the county had purchased and paid for the property. This alarmed Nelson. After Nelson had received definite information that the money had been paid by the county, he called the title company involved. Later, Nelson contacted the District Attorney's Office in Montgomery County. One phase of the evidence raises the following. Some months later, Nelson went before the grand jury. Later, Martinez attempted to contact Nelson through Martinez's father. Martinez and Nelson met at a parking lot at Champ's Restaurant on Interstate 45 just north of Houston. The two talked for about two hours and Nelson swore that Martinez offered him $20,000 if he (Nelson) would drop the charges. At the same meeting, Nelson swore that Martinez urged him strongly to drop the charges that made the basis of the indictment and Martinez said then that if he, Martinez, went down, "he wasn't going to go down by hisself (sic), that other people was going with him." Martinez then said that Curtis Nelson's brother would be the one that would go down with him. Martinez maintained that he knew something about some thefts of equipment alleged to have been done by the brother. But Curtis said he did not know anything about it and that he, Curtis, had to do what he had to do. Nelson had not received any monies at all from the sale of the church property to Montgomery County and he never permitted Billy Ray Martinez, or anyone else, to sign his name to any instrument.

The majority opinion affirms *that the church members* had decided to liquidate the church assets. Members certainly were in existence. Curtis Nelson for one was a member. Appellant by his many acts, words and course of dealing recognized and treated Nelson as a beneficiary, participant, and benefactor of the Tabernacle.

Of course if a trust is established for charitable or religious purposes, the constitutional inhibition against perpetuities or

remote vesting does not apply. *Boyd v. Frost National Bank,* 145 Tex. 206, 196 S.W.2d 497 (1946); *Kettler v. Atkinson,* 383 S.W.2d 557. It is also well established that "charitable purposes" included purposes the accomplishment of which would be beneficial to the community. Here we are dealing with a church or a tabernacle, similar ones had been held to be beneficial to the community. *Boyd v. Frost National Bank,* 145 Tex. 206, 196 S.W.2d 497; *Powers v. First National Bank of Corsicana,* 138 Tex. 604, 161 S.W.2d 273 (Tex. Comm'n App.1942, judgment adopted).

The court holds that this express trust failed. I think that the trust did not fail for several reasons. Firstly, the members of the Gospel Tabernacle were still identifiable and had visited with churches of the same denomination and persuasion at Cut and Shoot, Texas, and in Houston, and the ministers and pastors had exchanged pulpits.

In this connection, it is of paramount importance for our court to remember that the Court of Criminal Appeals vacated our prior judgment and remanded the cause to the Ninth Court for proceeding not inconsistent with the opinion and decision of the Court of Criminal Appeals delivered December 16, 1987, Judge Teague writing for a unanimous court, being reported at 742 S.W.2d 687. The Court of Criminal Appeals wrote in part:

"*Appellant was charged with misapplying trust property in violation of the Texas Trust Act, Art. 7425b–12, V.A. C.S., which prohibits a trustee from buying or selling any trust property from or to himself.... It was only necessary for the State to prove that he deeded to himself the property.*

"What we have said regarding the first misapplication count of the indictment is also applicable to the second misapplication count of the indictment. In that count, appellant was charged with unlawfully misapplying fiduciary funds to himself and others. The unlawful use of the deed enabled appellant to obtain the funds.

"As to the felony theft count, this related to obtaining a check from the County Treasurer of Montgomery County for the sale of the trust property to Montgomery County."

The Texas Courts have long recognized the favored status of charitable trusts, especially those for churches and religious organizations. *Boyd v. Frost National Bank,* 145 Tex. 206, 196 S.W.2d 497, and the rules of construction to sustain these trusts are more liberal. *See Scott v. Sterrett, supra.* Charitable trusts have long been held to include the advancement of religion. *Carr v. Jones,* 403 S.W.2d 181 (Tex.Civ.App.—Houston [1st Dist.] 1966, writ ref'd n.r.e.). In the case sub judice it is glaringly obvious that the three trustees were holding the property for the benefit of the Gospel Tabernacle and its members. It is axiomatic that the members of the Gospel Tabernacle were the beneficiaries of the charitable or religious trust as well as the cestui que trusts and as such of the Tabernacle and its members had the equitable title or the use title. *See Becknal v. Atwood,* 518 S.W.2d 593 (Tex.Civ.App.—Amarillo 1975, no writ); *Brelsford v. Scheltz,* 564 S.W.2d 404 (Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.). In fact, it is hornbook law that the beneficiaries of the Gospel Tabernacle were the real owners. The trustees had only the bare legal title but not the equitable title. The trustees stood in a serious and undoubted fiduciary relationship to the Gospel Tabernacle and each and every member or beneficiary thereof. Hence, the members were the owners. See *TEX.PENAL CODE ANN.SEC. 1.07(a)(24). See also In re Estate of Cogdell,* 426 S.W.2d 586 (Tex. Civ.App.—Eastland 1968, writ ref'd n.r.e.); *Parrish v. Looney,* 194 S.W.2d 419 (Tex. Civ.App.1946, no writ). The membership and certainly the beneficiaries of the Tabernacle remained in existence; the members may not have met in one particular building but the building is not the church. The members and beneficiaries visited as an identifiable group other churches of the same denomination or persuasion in nearby towns and the ministers or pastors of the nearby churches visited each other and sup-

plied the several pulpits. This happened on a number of occasions.

More importantly, the record shows that the actions of the Appellant himself showed that the Gospel Tabernacle was still in existence. The jury so found on strong evidence of probative force and value. It had not failed to exist as he tries to claim. The Appellant himself dealt with the Gospel Tabernacle as a viable church. There are many examples of this in the record. A few instances are: there was a $99,837.44 deposit made into the Gospel Tabernacle's then existing bank account on its deposit slips in November 1981. On November 17, 1981, by check or draft order No. 0669, the County of Montgomery, the State of Texas, at Conroe, Texas, paid $100,000 for the church property to Billy Ray Martinez. The bank statement dated 11/30/81 shows a deposit which is in excess of $99,000. There have been some incidental deductions that explain the $99,-000 plus deposit. The Appellant put that money into the existing account of the Gospel Tabernacle containing its address using its printed deposit slips. Immediately the Appellant paid out, according to the statement, thirteen checks or other transactions totalling $44,523.48. The checks were written on the Gospel Tabernacle Church's account and its name was printed on the check.

For example, the Appellant wrote a check for $10,000 to The Toddy Shop on 11/18/81 on the Gospel Tabernacle Church's Check No. 260. Likewise, the Appellant wrote a $4,500 check to Wesley Castleschmidt on 11/18/81 on the account of the Gospel Tabernacle Church being No. 262. On November 5, 1981, the Appellant wrote a check to one Jack Parker for $1,000 for materials on the Gospel Tabernacle Church's account using a check bearing its name—Check No. 278.

On November 18, 1981, the very next day after the Appellant got the $100,000 less the diminutive deducts, he wrote a check— he wrote two checks to Holly Moore. One for $5,000 and one for $4,000, totalling $9,000. These two checks to Holly Moore were written on the account of the Gospel Tabernacle Church using its checks with its name imprinted thereon. The checks made payable to Holly Moore were on consecutively numbered checks on the account of the Gospel Tabernacle bearing its logo, being numbers 258 and 259. Then on November 19, 1981, the Appellant Bill Martinez wrote a check to cash for $1,000 using a check in the Gospel Tabernacle checkbook No. 256, and on 11/20/81 made a check for $5,002 to Willis Bank. There were numerous other checks written on the Tabernacle's account, using its printed checks. On November 23, 1981, and by the end of that month, November 30th, he had written checks totalling, according to the Tabernacle's bank statement, $44,523.40, leaving a new balance of $55,971.13 as of the beginning of December 1981. The Gospel Tabernacle account showed 209 East Powell Street, Willis, Texas 77378, as its current address.

Apparently twelve checks or other transactions were made, and a $50 deposit was made in December 1981. The twelve checks and other transactions totaled $50,-321.60 leaving a new balance as of the bank statement day of 12/31/81 of $5,629.53. One of the checks was made payable to the Gulf States Utilities Company for the Gospel Tabernacle Church. On November 30, 1981 on Check No. 271, the Appellant wrote a check to Paul Davis for $30,000. On 12/3/81 on Check No. 281, the Appellant made a check payable to Willis Oil and Gas for $1,200. Then on December 18, 1981, on Check No. 285, the Appellant made a check for $1,600 to the Pitcock Trucking Payroll Account and on December 3, 1981, on Check No. 280 to Scooter's Fried Chicken for $10,000. These were checks on the account of the Gospel Tabernacle Church. There were several other examples: Check No. 273 to Bill Martinez for $3,500; Check No. 279 to Betty Carol Engel for $700; another Check No. 270 to Daryl Pitcock for $890; another Check No. 268 on 12/23/81 to R & L Auto for $827.58; and another one on 12/8/81 to Bill Martinez, Jr., for $1,000. So that the new balance on December the 31st, 1981, in the account of the Gospel Tabernacle was in the amount of $5,629.53.

Later, there was a deposit of $50, six checks and other transactions amounted to $5,579.39, leaving a new balance on January 2, 1982, of $50.14. So that the $99,000 plus check had been substantially spent and paid out in a two months' period of time. There were other documents showing a transfer of funds involving the Gospel Tabernacle, dated January 14, 1982, and January 21, 1982. The first one for $2,005.

Also there was a cashier's check in the amount of $5,000 payable to the Internal Revenue Service dated 11/20/81 in which the remitter was Bill Martinez.

The Eagle Title Company of Conroe, Texas, from the escrow account paid to the Appellant for the land and the tabernacle, a net sum of $99,037.44 on November 17, 1981, which was deposited the next day into the Gospel Tabernacle account by regular deposit ticket, using the Tabernacle's logo.

The Gospel Tabernacle had monthly statements issued to it, some of which are in the record. For example, there is a statement for March 31, 1981, showed a beginning balance of $5,230.82 and a closing balance of $1,431.15. During March of '81 the Appellant drew a check to cash for $500 and one to Daryl Pitcock for $800. The statement dated April 30, 1981, shows a beginning balance of $1,431.15 with deposits of $66,375.11 and a closing balance of $9,467.41. There was a statement dated May 29, 1981, as well as one dated 9/30/81.

So the Tabernacle had a very active bank account for a number of months before the $100,000 November 18, 1981, transaction.

There was some air-conditioning work done on or for the church as the Stone AC and Refrigeration was paid $52 on June 29, 1981 on Check No. 229. From the Tabernacle's bank statements, the cancelled checks and the deposit slips (all using its logo), the Appellant himself certainly dealt with the Gospel Tabernacle as an existing, viable, ongoing church or religious organization. It certainly had an active, viable bank account. There was a plumbing bill paid in November of '80 and a carpet bill paid in November of '80. There was an insulation bill paid in October of 1980 in the amount of $414. In my opinion this record—especially the documentary record—but the record as a whole shows that the Gospel Tabernacle was a viable, ongoing, existing religious congregation. The jury had a right and duty to decide this issue. The jury had a duty to weigh the evidence; the jury found against the Appellant. These acts were done by the Appellant. Thus, Appellant cannot deny the existence of the Tabernacle or its membership.

On another basis, however, there can be no doubt that an express trust was granted and express trust existed; it was a charitable trust under *TEX.REV.CIV.STAT.ANN. art. 4412a*, repealed by Acts 1987, 70th Leg., ch. 147, sec. 6(a), eff. Sept. 1, 1987, *now TEX.PROP.CODE ANN. sec. 123.001, et seq.* (Vernon Supp.1988). Hence, the Attorney General should have been notified if the trust was for any reason considered to be subject to termination. Appellant eviscerated the Attorney General's powers, duties and prerogatives under the law. The repeal of Article 4412a did not come into effect until September 1, 1987.

The said Article 4412a clearly and mandatorily requires that the Attorney General *shall be notified* in any suit or judicial proceeding to either terminate a charitable trust *or to distribute its assets or to depart from the objects of the charitable trust or to construe, nullify or impair the provisions of any instrument creating or affecting a charitable trust.*

Section 5 of Article 4412a specifically and mandatorily *provides that any dispute, claim or controversy of any character affecting a charitable trust may be, of course, settled or compromised either with or without the intervention of a formal court action or their approval of a court provided, however, that no such compromise or settlement or agreement shall either be valid or binding unless the Attorney General is a party thereto and joins therein.*

Appellant totally ignored this salutary statute. Here the Attorney General can use his judgment and discretion as to what may be in the best interests of the public. And the Attorney General, of course, still

had his full common-law powers and duties. The appellant never in any manner notified or served with process or contacted the Attorney General of Texas. Article 4412a has been brought forward in the Vernon's Texas Code Annotated Property Code Sec. 123.001, et seq. Hence, if termination was under some erroneous theory desired by Appellant, he was required to notify the Attorney General.

The Texas Trust Act, Article 7425b–6 provides in substance that where the title of the trustee is not merely nominal but is connected with some power of disposition or management of the real property corpus involved, then the same is considered an active and valid trust. Certainly this religious congregation (a charitable trust) was subject to the proper legal proceedings to its management or disposition. *And it should be noticed that Article 7425b–4 J provides that a beneficiary means any person entitled to receive from a trust any benefit of whatsoever kind or character.* Nelson and others were such beneficiaries. Certainly the members have the right to receive the benefit of their congregational church life and their church properties, even if illegally sold and wasted. In the clearest language Article 7425b–12 prohibits a trustee from buying or selling to himself. The Article in relevant part mandatorily provides:

"A trustee shall not buy nor sell, either directly or indirectly, any property owned by or belonging to the trust estate from or to itself or an affiliate ...; or from or to himself, a relative, employer, partner or other business associate...."

Appellee did not adhere or follow the Texas Trust Act. It is axiomatic that a trustee is in a fiduciary relationship to the beneficiaries or cestui que trust and a trustee owes them a solid duty of loyalty and fidelity. He must make a strict accounting of the properties of the trust. None of this did the Appellant do. Under this record in law the Gospel Tabernacle did not cease to exist. The membership thereof did not cease to exist.

Bear in mind the court does not deny the fact that there was a vast misapplication of fiduciary funds but reverses the first conviction in the first count in the indictment on the sole basis that the Gospel Tabernacle had ceased to exist. The Appellant's actions prove the contrary. The Tabernacle was opened to the *public and attempts were made, as do most churches, to increase its membership and open its doors to all interested persons.* Hence, this was a general type of intention to create a general charitable or religious trust. And, of course, it is well established the uncertainty in the identity of the actual individual beneficiaries is one of the usual, if not essential characteristics of a public charitable trust. *Powers v. First Nat. Bank of Corsicana*, 138 Tex. 604, 161 S.W.2d 273 (Tex.1942); *Clevenger v. Rio Farms, Inc.*, 204 S.W.2d 40 (Tex.Civ.App.—El Paso 1947, writ ref'd n.r.e.); *Taysum v. El Paso Nat'l Bank*, 256 S.W.2d 172 (Tex.Civ.App.—El Paso 1952, writ ref'd.). In fact, it has been held that the beneficiaries must be indefinite in number, otherwise the trust is considered to be a private one rather than a public one. *Eldridge v. Marshall National Bank*, 527 S.W.2d 222 (Tex.Civ.App.—Houston [14th Dist.] 1975, writ ref'd n.r.e.). The Appellant makes a frontal attack on the theory that the doctrine of cy pres does not and cannot be applied here. Thus he argues he could not have misapplied fiduciary funds. I would certainly hold otherwise. Appellant realizes that if cy pres is available, his alleged defense of no members or beneficiaries is not sustainable. Thus, he concedes he stands validly convicted if an equity court could reasonably invoke cy pres. Cy pres applies here for the several reasons discussed herein. It should be remembered it is important that the record reflects that Holly Moore was a bookkeeper or secretary to a Commissioner by the name of "Bo" Calfee. Appellant's grand jury testimony which was introduced into the trial of the case indicated that he and "Bo" Calfee were in business together at one time. Martinez also claimed that he had been paying Moore for gravel that he purchased. The purchase seemed something less than business-like. Martinez claimed that this was due to his and Holly Moore's life-long friendship. Martinez and

"Bo" Calfee, the Commissioner, were described as close friends. Martinez referred to Betty Carol Engel. Several checks were made to her. Appellant described Betty Engel as a gal that I like.

Certainly in this case the members or beneficiaries had a superior and worthier right to the money than did the Appellant. This is shown by the way he dealt with the misapplied funds. The indictment's pleading of the membership of the Gospel Tabernacle does not describe the "manner and means" by which the Appellant committed the offense and hence, the same was surplusage and did not have to be proved as such by the State.

The Appellant without question signed a deed conveying the real estate and improvements in question as a trustee for the Gospel Tabernacle. This unequivocal signing and executing of a solemn warranty deed to real estate works an absolute estoppel against him both as Grantor and Grantee. It also works an absolute estoppel against his privies, both in blood and estate. These estoppels result from the admissions or recitals contained in the deed. *Havard v. Smith,* 13 S.W.2d 743 (Tex.Civ.App.—Beaumont 1929, no writ); *Kimbro v. Hamilton,* 28 Tex. 561 (1866); *Parker v. Campbell,* 21 Tex. 763 (1858); *Greene v. White,* 137 Tex. 361, 153 S.W.2d 575 (Tex.1941); *Simonds v. Stanolind Oil and Gas Company,* 134 Tex. 332, 114 S.W. 2d 226 (1938); *Henderson v. Book,* 128 S.W.2d 117 (Tex.Civ.App.—San Antonio 1939, writ ref'd). Such written recitals made by the Appellant in instruments of legal effect constitute primary evidence of probative force.

This estoppel arises and is inexorable solely because the party or parties made the recitals of fact and admissions in a deed and in any other important instruments, having effect. Billy Ray Martinez, of course, was a party to the deed, and he admitted that he acted as a trustee for Gospel Tabernacle as well as a grantor of the Tabernacle. He and his privies in blood and estate are conclusively bound thereby. He may not aver against these recitals, he may not deny them and he may not attack them. This is not the type of estoppel that is rebuttable but it is a binding estoppel that is conclusive as a matter of law. *See Murphy v. Jamison,* 117 S.W.2d 127 (Tex. Civ.App.—Beaumont 1938, writ ref'd); *Roberts v. Chadwick,* 158 F.2d 374 (5th Cir.1946); *American Republics Corporation v. Houston Oil Company,* 173 F.2d 728 (5th Cir.1949), *cert. den'd,* 338 U.S. 858, 70 S.Ct. 101, 94 L.Ed.2d 526.

The Appellant simply cannot take the position that the Gospel Tabernacle does not exist, nor that same has no members or beneficiaries. This doctrine is an additional reason for dissenting from the majority opinion on this point. *La Cour Du Roi, Inc., v. Montgomery County,* 698 S.W.2d 178 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.).

Pursuant to the matters and reasoning set out above, I would vote to affirm each of the two convictions for misapplication of fiduciary properties.